**UNITED STATES of America Plaintiff,**

v.

**Gerald DRASEN, Anthony Aleo, and Cynthia Aleo, Defendants.**

**No. 86 Cr 500.**

United States District Court,
N.D. Illinois, E.D.

Jan. 15, 1987.

On Motion to Reconsider May 20, 1987.

Lawrence E. Rosenthal, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Paul J. Petit, Betar & Petit, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

The government has brought a thirteen count indictment[1] against defendants Gerald Drasen, Anthony Aleo, and Cynthia Aleo. Specifically, Gerald Drasen is charged with unlawfully dealing in short-barrel rifles, aiding and abetting in the transfer of short-barrel rifles, and possessing various machinegun receivers, in violation of 26 U.S.C. § 5861. The indictment further charges defendants Anthony Aleo and Cynthia Aleo with aiding and abetting in the dealing and transfer of short-barrel rifles, in violation of the same statute. The defendants, represented by joint counsel, have moved to dismiss the indictment. For the reasons stated below, the motion is denied in part and granted in part.

### Motion to Dismiss

The indictment breaks down into four categories of counts and the defendants attack the legal sufficiency of each category. Accordingly, the court will address these attacks category by category.

*Counts I and III–VII*

These counts of the indictment all charge the defendants with the sale of unregistered short-barrel rifles, not by the sale of assembled short-barrel rifles, but by the sale of the constituent parts from which a short-barrel rifle could easily be assembled. The defendants' contention is that the sale of such constituent parts of a rifle does not constitute the sale of a "rifle" within the meaning of the statute.

Title II of the Gun Control Act of 1968, under whose provisions the defendants are

---

1. On January 9, 1987, the January, 1987 Grand Jury returned a superseding indictment in this case. In many respects it is identical to the original indictment, but there are some significant differences. Count XIV of the original indictment is not included in the superseding indictment. Counts III–VII, previously alleging only the sale of rifles through the sale of never-before-assembled constituent parts of a rifle, have been expanded to allege that such a "rifle" also "constituted a combination of parts from which a machinegun can be assembled." Count I, previously alleging only that Drasen was a dealer in rifles, now alleges that he was a dealer in rifles and machineguns. Nothing in this opinion addresses the legal sufficiency of these new allegations.

charged here, requires registration of certain weapons which fall within the definition of "firearm." In particular, a "firearm" is, among other things, a "rifle having a barrel or barrels of less than 16 inches." 26 U.S.C. § 5845(a). Possession of such a Title II firearm must be registered in the central registry maintained by the Secretary of Treasury pursuant to 26 U.S.C. § 5841. Subsequent transfer of such a firearm must be in compliance with 26 U.S.C. § 5812 which requires a written application to the Secretary of Treasury and the payment of a transfer tax. Title II also defines "rifle" as follows:

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, *and shall include any such weapon which may be readily restored to fire a fixed cartridge.*

26 U.S.C. § 5845(c) (emphasis added). The crucial question in these counts pertains to the legal effect of the underscored portion of the definition of rifle. The defendants contend, and the government apparently agrees, that the rifle components which defendants allegedly sold, have never been combined to form complete rifles. Therefore, the issue here is whether unassembled, and never-before assembled, parts of a rifle nevertheless constitute a "rifle" within the meaning of the statute.

The defendants launch several persuasive arguments suggesting that the component parts involved in this case do not fall within the statute's definition of "rifle." First, defendants argue that the plain meaning of the language "and shall include any such weapon which may be readily restored to fire a fixed cartridge" cannot include a group of parts which have never been assembled into a working firearm. According to defendants, one cannot "restore" to firing condition a group of parts which have never before been in firing condition. To further support their reading of the word "restore," defendants

contrast the definition of "rifle" with that of "machinegun" in 26 U.S.C. § 5845(b), another type of "firearm," *see id.* § 5845(a). The statute defines "machinegun" to include not only any weapon which "can be readily restored to shoot" but also "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

The defendants' second argument is that no case has applied the "readily restored to fire" language of the "rifle" definition to hold that a group of parts which might be assembled into a rifle, but never has been, is nevertheless a rifle. According to defendants, the cases dealing with "rifles," as well as "machineguns," and "shotguns" (another type of "firearm"), involve only weapons which had once been assembled and in firing condition, though the weapons were discovered disassembled.

Defendants' third argument concerns the legislative history of the statute. Defendants point out that in enacting the Gun Control Act of 1968, Congress expanded the definition of "machinegun" to include "any combination of parts from which a machinegun can be assembled." Congress supposedly considered, but rejected, a similar expansion of the statutory definition of "rifle" to include a "combination of parts" clause. *See Federal Firearms Act, Hearings Before the Subcommittee To Investigate Juvenile Delinquency, Judiciary Committee*, U.S. Senate, 90th Cong., 1st Sess. 1086–1087 (1967). Therefore, defendants conclude, this court should not interpret the definition of "rifle" to cover a "combination of parts" which could be made into a rifle.

The government's response to these arguments is basically twofold. First, the government contends that the meaning of the language "readily restored to fire" in the "rifle" definition can be determined from the legislative history, and the defendants have erroneously read that history. The government explains that the Gun Control Act of 1968 made two changes in the definition of "rifle," only one of which is relevant here. That change is the addi-

tion of the last clause of the definition, the clause stating that a "rifle" includes "any such weapon which may be readily restored to fire a fixed cartridge." The authors of this language stated that it was their intention in making this change to ensure that the language of the statute was "consistent with the administrative construction of existing law." H.R.Rep. No. 1577, 90th Cong., 2d Sess. 46 (1968); S.Rep. No. 1501, 90th Cong., 2d Sess. 46 (1968). The government then cites a Revenue Ruling of the Commissioner of Internal Revenue. The ruling, although not specifically cited in the above legislative history, nevertheless constitutes part of the then "administrative construction of existing law." It stated that "[t]he possession or control of sufficient parts to assemble an operative firearm ... constitutes the possession of a firearm.... Further, the transfer ... of sufficient parts to assemble an operative firearm is deemed to constitute the transfer of a firearm subject to the [transfer] tax." Rev.Rul. 54–606, 1954–2 C.B. 33. This administrative construction, which the Gun Control Act authors apparently intended to capture by the word "restore" does not require that the unassembled parts actually once have been assembled into an operational firearm. Instead, all that is required is that the possessor or transferor have parts sufficient "to assemble" an operative firearm. The previous history of those "parts" is thus apparently irrelevant.

Accordingly, the legislative history provides some support for the government's broad reading of the word "restore." Nevertheless, it may seem somewhat odd that the definition of "machinegun" includes both the "readily restored" language and the "combination of parts" language, where the definition of "rifle" includes only the former. This difference must be explained.

The government explains this significance again by resorting to the legislative history. In amending the definition of "machinegun" in 1968, the authors of the legislation stated that the first sentence of section 5845(b) (the "readily restored to" language) was meant to restate the existing law. *See* H.R.Rep. No. 1577, 90th Cong., 2d Sess. 45 (1968); S.Rep. No. 1501, 90th Cong., 2d Sess. 45 (1968). In further commenting on the "readily restored to" language in the context of the definition of "shotgun," where this same language also appears, the authors of the statute observed that it was intended to overrule a single district court decision that interpreted the pre–1968 firearms definition as not reaching a firearm (in that specific case, a "shotgun") that was missing only the easily replaceable firing pin. *See* H.R.Rep. No. 1577, 90th Cong., 2d Sess. 46 (1968); S.Rep. No. 1501, 90th Cong., 2d Sess. 46 (1968) (commenting on *United States v. Thompson*, 202 F.Supp. 503 (C.D.Cal.1962)). Thus, the "readily restored to" language was not meant to extend the definition of a "firearm" to unassembled parts of a "firearm." According to the previously discussed 1954 Revenue Ruling, the definition of "firearms" such as "rifles," "machineguns," and "shotguns" already included such unassembled weapons. Instead, "readily restored to" was meant to ensure that a weapon missing an easily replaceable part was also nevertheless within the reach of the statute.

The presence of "combination of parts" language, which is found in the "machinegun" definition, but not "rifle" definition, can now be explained. The second sentence of the "machinegun" definition contains the "combination of parts" language. It states that "the term [machinegun] shall also include the frame or receiver of any such weapon ... and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." A possible interpretation of the "combination of parts" language is that it is meant to reach the subset of "machineguns" consisting of "frames" or "receivers." That is, the second sentence of this definition is meant to reach "any combination of parts" from which a "machinegun," i.e., a "frame or receiver" can be made. As the government explains, this interpretation is sensible given the differing physical characteristics of machineguns and rifles. The frame and receiver of a rifle are lawful because

they can be used to assemble unregulated weapons, such as rifles having barrels of 16 inches or more (non-"sawed-off" rifles). However, the frame and receiver of a machinegun cannot be used in any unregulated weapon. Hence, Congress specifically sought to include language in the machinegun definition to cover frames, receivers, *and their combination of parts.* That may be why the "combination of parts" language appears in the "machinegun" definition and not the "rifle" definition.

The government concludes its discussion on the legislative history by refuting the defendants' interpretation of the letter to the Senate Judiciary Committee. According to the defendants, this letter argued against a proposal to include "combination of parts" language in the "rifle" definition. As the full text of the letter indicates, the proposal sought to include within the definition of "rifle," the frames and receivers of rifles, and presumably their respective combination of parts. Congress decided not to extend the definition of "rifle" to include rifle frames and receivers and their combination of parts, so the absence of the "combination of parts" language from the rifle definition, does no damage to the government's position. Indeed, the text of the letter indicates that the author of the letter (the General Counsel to the Department of Treasury) considered the Gun Control Bill "to represent the administrative construction of existing law and to clarify a situation resulting from conflicting judicial decisions concerning the status of firearms which are disassembled or which are complete and operable except for a readily restorable part or parts." *Federal Firearms Act, 1968: Hearings on S. 1854 Before the Subcomm. To Investigate Juvenile Delinquency,* 90th Cong., 1st Sess. 1087 (1967). This quotation is fully consistent with the government's position.

While the legislative history presented in this case suggests that a "rifle" includes the constituent parts of a rifle, even though those parts were never assembled, the court is also interested in whether any cases confirm this view. As the defendants correctly argue, there appear to be no reported cases squarely upholding the government's position. Indeed, it seems that most of the pertinent "rifle" cases involve rifle parts that, although discovered in unassembled form, were once assembled. In the remaining cases, the previous history of those parts is simply not explicitly addressed. However, just as there are no cases squarely upholding the government's position, none of the defendants' cases expressly hold that prior, assembled status of rifle parts is *necessary* before unassembled rifle parts will be deemed "rifles" under the "readily restored to fire" definition.

Some guidance, however, may be gleaned from the Seventh Circuit's opinion in *United States v. Zeidman,* 444 F.2d 1051 (7th Cir.1971). In that case, the Court upheld the seizure of a short-barrel rile that was found in two parts, that is, in two separate drawers of the same dresser. The Court reasoned that since the two parts could be easily combined to form a "rifle" within the meaning of the federal statute, the two parts themselves also constituted a "rifle," and as such, the "rifle" was required to be registered under 26 U.S.C. § 5841. *See id.* at 1053. Significantly, the Court made no express finding as to whether the two parts, at any time prior to the seizure, had ever been assembled into a complete rifle. As the Court explained the facts, investigators were on the defendants' premises lawfully, pursuant to a warrant to seize a "machine pistol." Though they did not find the warrant-specified item, they found the two parts of another firearm, the rifle. The Court noted that "[n]o mention was made in the warrant of the Browning pistol and shoulder stock [the "rifle" parts], notwithstanding that Zeidman had allegedly shown these two items to investigator Conroy on January 11." 444 F.2d at 1053. The use of "two" in this passages suggests that the two rifle parts were not assembled when originally presented to the undercover investigator. The Court then upheld the seizure of the two rifle parts as an unlawfully possessed "rifle" because the parts were discovered in the course of a legitimate search and "[w]hen viewed together, the interrelationship of these two items is

apparent, even without prior knowledge of their connection." *Id.* This second passage seems to indicate, somewhat inconsistently with the first cited passage, that the two parts may have once been connected. However, at the same time, the passage also suggests that the seizure of the interrelating parts was valid, even if the investigators did not know that the ·rifle parts had once been connected. In other words, the investigators were entitled to seize rifle parts as an unlawful, unregistered "rifle," (at least for probable cause purposes), even if they had no knowledge of whether those parts had once been connected. Thus, to the extent that the rifle parts in *Zeidman* had in fact once been assembled, the Court seemed to intimate that this may not have been relevant to their illegality. And to the extent that the rifle parts had never been assembled, or the Court failed to render an express opinion on the point, it may be reasonable to assume that the Court did not find such prior history to be relevant to whether the two parts constituted a "rifle."

This court has expressed the government's position as strongly as possible. Nevertheless, the court still has grave doubts about whether the statutory language "readily restored to" has put the defendants on sufficient notice to adequately inform them that their conduct in dealing with never assembled rifle parts was illegal. When the government's rhetoric is washed aside, its position essentially comes down to a single Revenue Ruling, indirectly referred to in the legislative history. That ruling does not even squarely support the government's position since it does not indicate one way or another whether rifle parts need to have been once-before assembled in order to be a "rifle." It only addresses the present, unassembled status of the rifle parts and states that if they can be assembled into a rifle, the parts are a rifle. Thus it fails to address the relevance of the previous history of those parts. However, that previous history is the precise issue this court faces in evaluating this indictment. Thus, the Revenue Ruling is a thin reed on which to hang federal prosecution.

Moreover, the *Zeidman* case is hardly convincing support for the government's position. It rendered no express opinion on the issue before the court now. The precise issue before the Court there was whether there was probable cause for a warrantless seizure of a rifle in two parts. The issue here is quite different—it is whether the indictment properly states the elements of a statutory crime. Furthermore, no other case cited by the government holds that the firearms statute covers rifle parts that have never been assembled.

 In view of this weak support for the government's position, the court must dismiss Counts I and III–VII. Although there is some legislative support for the government's reading of "restore," it is simply not strong enough to overcome the presumption against interpreting a word to mean something other than its standard English usage, and the presumption in favor of construing criminal statutes against the government. There is no doubt that when the government seeks to prosecute conduct it deems punishable, it must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *see also United States v. Petrillo,* 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947) (the test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices). There is no doubt, as the Seventh Circuit has recently demonstrated, that courts should not contort the meaning of words beyond their common usage. *See United States v. DeCastris,* 798 F.2d 261 (7th Cir.1986) (observing that the words "resume or assume employment" do not necessarily cover a person who continues employment in the same job during the relevant time period). These standards have been violated here. All persons of common intelligence understand "restore" to mean "return to a previous condition." People are not required to divine the government's secret modification of that definition, nor are they required to assume that legislative histories, court de-

cisions, and revenue rulings resolve legal questions that are not directly presented in those histories, decisions, and rulings.

In sum, the government in this case has attempted to give "restore" an unusual meaning. People ordinarily do not think that rifle parts can be "restored" to a rifle if those parts never were previously assembled as a rifle. The legislative history is too indirect and scant to convey a "sufficiently definite warning" to individuals of the government's now-proffered definition. In these circumstances, the due process guarantee of "fair notice" of criminality would be violated if prosecution proceeded on these counts. *See United States v. Powell*, 423 U.S. 87, 92–93, 96 S.Ct. 316, 319–20, 46 L.Ed.2d 228 (1975); *United States v. Harriss*, 347 U.S. 612, 617–18, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954). Accordingly, these counts must be dismissed, as they appear in the original indictment.

*Counts VIII and IX*

These two counts charge defendant Drasen with possession of unregistered machinegun receivers, not by the possession of assembled receivers, but by possession of unassembled constituent parts of machine gun receivers. Drasen seeks to dismiss these counts on grounds similar though not identical to the grounds raised in the previously discussed counts. Specifically, Drasen does *not* argue that the federal statute covers only previously assembled machinegun receivers. Rather, he argues that while the federal statute covers "machineguns" and weapons which can be "readily restored to" machinegun status, and while it also includes machinegun "receivers," it does not include objects which can be "readily restored to" receiver status or the constituent "parts" of machinegun receivers. Thus, defendants argue that disassembled parts of a once-assembled receiver do not constitute a receiver. As to this argument, the court has little difficulty rejecting Drasen's reading of the statute.

■ The type of "machinegun" which must be registered under the federal statute is defined in that statute as follows:

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). Thus, under the first sentence of the definition, a "machinegun" is any weapon which "shoots" or can be "readily restored to shoot." Under the second sentence, a "machinegun" is also a "frame or receiver" of any such weapon. Finally, also under the second sentence, a "machinegun" is "any combination of parts from which a 'machinegun' can be assembled." As explained earlier, since "machinegun" includes "frames or receivers," the second sentence may properly be interpreted as stating that a "machinegun" is also "any combination of parts from which a 'frame or receiver' can be made." Thus, under the plain language of the statute, Drasen's possession of unregistered receiver *parts* comes within the reach of the statute (assuming that those parts can be "combined" to form a receiver).

Drasen resists this conclusion by pointing to the regulatory definition of "frame or receiver":

That part of a firearm which provides housing for the hammer, bolt or breechlock and firing mechanism, and which is usually threaded at its forward end to receive the barrel.

27 C.F.R. § 179.11. Drasen argues that since this definition speaks only of "that part" rather than "that part or parts," it is contrary to regulatory authority to extend the definition of receiver to include the "parts" of a receiver. However, the controlling statute itself as just explained, reaches not only a complete frame or receiver, which is defined in the administrative regulation as one "part," but also "any combination of parts" from which a "machinegun," which by definition includes a

"receiver," can be made. Thus, the regulation merely defines a complete receiver. However, since the controlling statute covers not only complete receivers but also "any combination of parts from which 'frames or receivers' can be assembled," the regulatory definition should not be interpreted to limit the coverage of the authorizing statute.

Finally, Drasen argues that the receiver parts in question in this case had been cut in half so as to require welding to become a complete "receiver." Thus, Drasen contends, more than a mechanical operation is necessary to restore or assemble these parts into a complete receiver and they are hence not "readily restored" to receiver status. The court must reject this argument too.

First, it is not clear that the "readily restored to" language of the first sentence of the "machinegun" definition applies to the court's interpretation of the second sentence which defines a machinegun as including "any combination of parts from which 'frames or receivers' can be assembled." After all, as the court has interpreted that sentence, it does not on its face state "from which 'frames or receivers' can be readily assembled." However, the court will assume that such is the meaning of the statute. Even so, the question of whether the two halves of the receiver involved in this case can actually be readily assembled into a complete receiver is a question of fact which the court may not address on a motion to dismiss the indictment. Accordingly, as a legal matter, Counts VIII and IX are sufficient to withstand Drasen's motion to dismiss.

*Counts X—XIII*

In these counts of the indictment, as modified by the Bill of Particulars, Drasen is charged with possession of an unregistered "mini-gun" housing which the government claims is the "receiver" of this weapon. Drasen argues for dismissal of these counts on two grounds. First, he contends that the housing which he allegedly possessed is not a "receiver" within the meaning of the statute. Second, he argues that the "mini-gun" is not a "machinegun" within the meaning of the statute, and so regardless of whether the housing is a "receiver," registration of that housing is not required by law since only "firearm" receivers need to be registered.

As to the first argument, Drasen maintains that no statutory, regulatory, or decisional authority has ever determined that a "mini-gun" housing is a receiver. Contrary to this assertion, there is indeed regulatory authority holding that "housing" is a "receiver." As cited earlier in this opinion, the definition of a "receiver" is "[t]hat part of a firearm which provides *housing* for the hammer, bolt, breechlock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 179.11 (emphasis added). Thus, the housing of a firearm constitutes the receiver of a firearm. The next question, then, is whether a "mini-gun" is a "firearm" within the meaning of the statute. As the government and Drasen have narrowed the issue, the question really is whether a "mini-gun" is a "machinegun."

According to Drasen, the "7.62mm Minigun" is not a typical automatic fire weapon. It is essentially a Gatling gun with six barrels each of which has its own firing chamber and firing mechanisms housed by a rotor which is rotated by an electric motor. As each barrel reaches a fixed point in its rotation, a round is fired from that barrel. The "mini-gun" is really six guns lashed together and driven by an electric motor to accomplish rapid fire.

The specific Revenue Ruling that the parties agree governs whether this device is a machinegun provides as follows:

Pursuant to consideration and evaluation of available data respecting Gatling guns, the Internal Revenue Service has concluded that such guns fall within two classifications, as follows:

1. Any crank-operated gear-driven Gatling gun (produced under 1862 to 1893 patents) employing a cam action to perform the functions of repeatedly cocking and firing the weapon, as well as any such gun actuated by an electric motor in lieu of a hand-operated crank (produced under 1893 and later patents), while be-

ing a forerunner of fully automatic machineguns, is not designed to shoot automatically or semiautomatically more than one shot with a single function of trigger. Such weapons are held *not* to be firearms within the purview of the National Firearms Act (Chapter 53 of the Internal Revenue Code of 1954).

2. Any Gatling gun designed or redesigned to employ the hand crank only to sear off the first round of ammunition, thence becoming a gas-operated fully automatic machine gun (adapter patented in 1895) is held to be a firearm within the purview of the National Firearms Act, specifically, section 5848(2) [defining "machinegun"] of the Internal Revenue Code of 1954.

Rev.Rul. 55–529, 1955–2 C.B. 482 (emphasis original).

The indictment and the Bill of Particulars do not specify whether the mini-gun receiver Drasen possessed was designed for a mini-gun of the paragraph-one type or paragraph-two type. Drasen's generic description of a mini-gun suggests that all mini-gun receivers fall within paragraph one. However, the government insists that at trial it will adduce expert testimony rebutting Drasen's contention that his mini-gun receivers were intended only for the paragraph-one type. The government claims it will prove that Drasen's mini-gun receivers were designed for fully automatic firearms, the paragraph-two type. Thus, the court must reserve for trial the factual question of whether the mini-gun receivers identified in Counts X through XIV are intended only for weapons that can shoot only one shot per pull of the trigger, or whether they are intended also for weapons that can fire automatically. If only the former turns out to be the case, then under the Revenue Ruling the receivers would not be "firearm" or "machinegun" receivers within the purview of the statute. Since registration of such unregulated receivers is not required under the statute, those counts would then have to be dismissed. But at this stage in the proceedings, these counts of the indictment are legally sufficient to withstand the motion to dismiss.

*Count II*

As amended by the Gun Control Act of 1968, the National Firearms Act includes within the definition of "machinegun": "any combination of parts designed and intended for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). The defendants are charged in Count II with the unregistered sale of such a "conversion kit" in two installments, on July 17, 1985 and August 6, 1985.

In its Bill of Particulars, the government explains that its prosecution is based on the sale of the constituent parts of a conversion kit to a single purchaser on two separate days, and that such a sale constitutes the sale of a "machinegun."

■ Defendants argue that the piecemeal sale of the constituent parts of a conversion kit does not come within the reach of the federal statute. The court does not agree. Defendants' position assumes that it is impossible to sell a "combination of parts designed and intended for use in converting a weapon into a machinegun" unless that sale occurs on one occasion. However, if a portion of that combination is sold on one day, with the intention that the other portion will be sold to the same purchaser on another day, and in fact such other portion is later sold to that purchaser, then the seller has indeed sold a "combination of parts designed and intended for use in converting a weapon into a machinegun." Of course, if the defendants sold the first portion to a purchaser on one day *without* intending to sell that purchaser the second portion on another day, then the first portion, even if deemed a "combination of parts," would not be a "combination of parts designed and intended for use in converting a weapon into a machinegun." The lack of any intent to sell the second portion, which portion is necessary for the conversion kit to be complete and fully operable, would necessarily mean that the seller failed to sell a "combination of parts *designed and intended*" to convert a weapon into a machinegun.

In this case, the Bill of Particulars adequately alleges that the defendants intend-

ed that the sale of the first portion of the conversion kit would be followed by a later sale of the remaining portion: "With respect to count two, the government does contend that the sale of the constituent parts of a conversion kit to a single purchaser on two separate days, *if done knowingly*, does constitute the sale of a 'machinegun' within the meaning of the statute." (emphasis added). The court construes the government's use of the word "knowingly" to mean that it is accusing the defendants of having the intention to sell a complete kit over the course of two separate days. If this intention is not proven at trial, this count will fail. But as a legal matter, the count alleges conduct that is prohibited by the statute. Count II therefore will not be dismissed.

### Conclusion

The defendants' motion to dismiss the indictment is granted as to Counts I and III–VII, and denied as to all remaining counts. The court will address the motion to suppress and discovery motions by separate opinion.

### ON MOTION TO RECONSIDER

Before the court is the government's motion to reconsider this court's Memorandum Opinion and Order of January 15, 1987, in which the court dismissed Counts I and III–VII of a thirteen count indictment brought against defendants Gerald Drasen, Anthony Aleo, and Cynthia Aleo. The defendants are charged with unlawfully dealing in short-barrel rifles, aiding and abetting in the transfer of short-barrel rifles, and possessing various machinegun receivers, in violation of 26 U.S.C. § 5861. Counts I and III–VII of the indictment all charge the defendants with sale of unregistered short-barrel rifles, not because they sold assembled short-barrel rifles, but because they sold constituent parts from which a short-barrel rifle could easily be (but never had been) assembled. The court agreed with the defendants' contention that the sale of such constituent rifle parts does

not constitute the sale of a "rifle" within the meaning of 26 U.S.C. § 5845(c). Consequently, the court dismissed those counts. The government now moves for a reconsideration of that decision.[1]

The government in its motion has expressly confined itself to three points suggested by this court's earlier opinion. First, the government argues that this court's focus on the portion of the "rifle" definition containing the words "readily restored to fire" overlooked the government's separate contention that the constituent parts of a rifle should be considered tantamount to the rifle itself, without reliance on the "readily restored to" clause of § 5845(c). Second, the government maintains that the court's holding on the "fair notice" issue appears to be inconsistent with the law governing strict liability offenses such as those charged here. Third, the "policy" implications of the court's holding seem to be at odds with the intent of Congress in enacting the firearms law.

As to the first point, the government argues that the January 15 opinion proceeded on the premise that the only portion of the statutory definition of a "rifle" which could arguably reach the constituent parts of a short-barrel rifle was the "readily restored to fire" language, which was added to the statute in 1968. After extensively discussing the issue, the court held that the "readily *restored* to fire" clause meant that the firearms statute prohibited the sale only of unassembled rifle parts that had once been fully assembled, and not unassembled rifle parts that had never been assembled. Only the former could be readily "restored to fire." The court did not, however, expressly discuss the government's separate contention that the constituent parts of a short-barrel rifle should themselves be considered a "rifle," entirely apart from the question of whether they can be considered "readily restored to fire." This contention was not discussed because the government placed virtually all

---

**1.** Actually, the government has moved this court to reconsider its decision to "dismiss counts one through seven of the indictment." Gov.Br. of 2–4–87 at 10. The court did *not* dismiss Count

II of the indictment. See Mem.Op. and Order, Jan. 15, 1987 at 20–22. The court assumes that the government is only asking for a reconsideration of the dismissal of Counts I and III–VII.

emphasis on the "readily restored to fire" clause. However, the court now considers this contention outright and rejects it.

Under 26 U.S.C. § 5845(c):

The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be. readily restored to fire a fixed cartridge.

The government argues that unassembled and never-before-assembled parts of a rifle constitute "a weapon designed, ... made, ..., and intended to be fired from the shoulder and designed ... and made ... to use the energy of the explosive in a fixed car-. tridge to fire only a single projectile...." The court does not agree that unassembled and never-before-assembled rifle parts constitute a "rifle" within the meaning of the statute. Specifically, the court has great difficulty seeing how the never-assembled constituent parts of a rifle are themselves a weapon "made" to fire.

The government's support for its contention is based first on the Internal Revenue Service's Revenue Ruling 54–606, 1954–2 C.B. 33. This ruling, issued under pre–1968 law, stated that "the transfer of sufficient parts to assemble an operative firearm constitutes a transfer of a firearm subject to the transfer tax." In the January 15 opinion, the court stated that this revenue ruling provided insufficient authority to establish the conclusion that the transfer of the constituent parts of a never-before-assembled rifle was subject to the transfer tax because the ruling did not address the relevance of the previous history of the currently unassembled rifle parts. It only addressed the present, unassembled status of the rifle parts and states that if they can be assembled into a rifle, the parts are a rifle. However, the significance of the previous history of those parts—whether they must have been once-fully-assembled to come within the reach of the statute—is the precise issue before this court and was not expressly addressed in that ruling.

The government resists this conclusion by suggesting that if the Commissioner had really intended to limit the meaning of the ruling to only once-assembled rifles, he would have used more precise language. This argument has some plausibility, but it is defeated by the government's own proof of legislative history. The government has established, as the court discussed in the January opinion, that when the Gun Control Act of 1968 added the "readily restored to fire" language to the rifle definition, it was Congress's intention to ensure that the language of the amended statute was "consistent with the administrative construction of existing law." H.R.Rep. No. 1577, 90th Cong., 2d Sess. 46 (1968); S.Rep. No. 1501, 90th Cong., 2d Sess. 46 (1968). Thus, in Congress' (and the government's) view, the "readily restored to fire" clause merely reenacted the administrative revenue ruling. This means that Congress interpreted the revenue ruling as applying only to those rifle parts which could be "restored" to assembled condition. Congress therefore did not regard that ruling as applying to rifle parts which had never before been assembled since such rifle parts could not be "restored" to anything. The court thus rejects the government's contention that revenue ruling provides authority for its theory that never-before-assembled rifle parts are tantamount to a rifle. The enactment of the "readily restored to fire" clause in 1968, and the legislative history establishing that this clause merely restates existing administrative law, strongly suggest that the revenue ruling only covers rifle parts that had at some point been previously assembled into a complete rifle.

Next, the government proffers several cases which it argues support the conclusion that rifle parts—regardless of their prior history—are tantamount to a rifle. First, the government relies on *United States v. Zeidman*, 444 F.2d 1051 (7th Cir. 1971), a case discussed in the January 15 opinion. In *Zeidman*, the court affirmed a conviction under § 5681 for possession of a rifle over the defendant's contention that the police search which uncovered his pos-

session of the rifle was invalid. The police inadvertently discovered the rifle in two parts while conducting a valid search for something else. Zeidman argued that, because the rifle was in two parts, it was not a "firearm" within the meaning of the law and therefore there were no grounds for justifying the seizure. The court rejected Zeidman's argument because the interrelationship between the two parts was "apparent." *Id.* at 1053.

*Zeidman* does not support the government's position here. That case merely established that the inadvertent discovery of an unassembled short-barreled rifle provides the necessary probable cause for a seizure. It did not establish—because the issue was not relevant—that those unassembled parts need not ever have been fully assembled in order to sustain the legal sufficiency of a conviction for possessing a rifle. If anything, the court's opinion actually suggests that the seized rifle may have once been fully assembled. *See id.* at 1052 ("Zeidman told [an undercover investigator] that he had a *fully operable* ... 9 millimeter Browning high powered pistol with a detachable shoulder stock." (emphasis added)). Thus, this court does not view *Zeidman* as establishing the legal proposition the government urges.

Nor is the government's citation to *United States v. Lauchli*, 371 F.2d 303 (7th Cir.1966) persuasive. That case affirmed a conviction for dealing in "machineguns." At the time of this case, the "machinegun" definition was similar to the current definition of "rifle." 26 U.S.C. § 5845(b) defined a machinegun as "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot...." The Seventh Circuit affirmed Lauchli's conviction for selling 102 unassembled machineguns. This case, like *Zeidman*, however, does not support the government's conclusion that the sale of never-before-assembled rifle parts is tantamount to the sale of a complete rifle.

In affirming the conviction, the Court first discussed Revenue Ruling 54–606, the same ruling the government proffers in this case. The Seventh Circuit regarded that ruling as a "recognition" that "disassembly of complete weapons" was within the purview of the firearms statute. *Id.* at 312. The Court's use of the word "disassembly" suggests that it viewed the ruling as reaching firearms which had at one time been assembled (otherwise, they could never become *dis* assembled). The government in that case also argued that it would be too easy to violate the Act "if disassembly of complete weapons removes them from the purview of the Act." *Id.* Furthermore, the Court then stated that it "need not go so far as" the revenue ruling to hold Lauchli's conduct illegal. *Id.* Apparently, the Court felt that because the defendant knew the buyer planned to assemble the firearms, because the defendant had actually assisted in the assembly of some of the firearms, and because the buyers "demanded operable machineguns," the machinegun parts in that case were deemed "machineguns" within the meaning of the Act, even without considering the effect of the revenue ruling. *Id.* at 312–13.

The Court's reasoning in *Lauchli* does not help the government here. First, in *Lauchli* the defendant indicated his expectation that the machinegun parts would be assembled into complete machineguns and that the buyers demanded operable guns. It was because of this that the Court felt the defendant actually sold "machineguns," and it could reach this conclusion without "going so far as" the revenue ruling. In this case, there is no allegation in the indictment or Bill of Particulars suggesting that the defendants or the buyers expected these parts to be combined into complete weapons. More importantly, though, the Court viewed the revenue ruling (albeit in dicta) as only reaching disassembled firearm parts, thus implying that the ruling reaches only previously assembled firearms. Thus, in the Seventh Circuit's view, the revenue ruling does not help the government's position in this case, and neither does the Court's actual holding in *Lauchli* since here, unlike that case, there is no allegation that the defendants sold the rifle parts with an expectation that they would be assembled later, or that the buyers had "demanded" operable rifles.

This court's reading of *Lauchli* is confirmed by the Seventh Circuit's remarks in another case the government cites, *United States v. Shafer*, 445 F.2d 579 (7th Cir. 1971). There, the Court dealt with the possession of unassembled "destructive devices." Citing to *Lauchli* itself, the Court held: "We agree with the government that the grenade shells, fuses, and powder here may be considered such a firearm, even though disassembled." *Id.* at 583. Again, the Court's use of the word "disassembled" suggests that the constituent parts of a firearm must have once been assembled to be within the purview of the Act.

The Seventh Circuit's use of the word "disassembled" (as opposed to "unassembled") in *Lauchli* and *Shafer* should not, I think, be regarded as accidental. As just discussed, the Court in *Lauchli* was comfortable with affirming the defendant's conviction because of the strong evidence establishing that he had intended to sell, and the purchasers had intended to buy, machinegun parts that could be assembled into complete weapons. Thus, a defendant's intent that the constituent parts become a complete weapon is necessary for a machinegun conviction based on the sale of machinegun parts. Presumably, such "intent" could also be established by evidence that the defendant has sold weapon parts that were once fully assembled. The previous, assembled status of those parts could reasonably permit the conclusion that the seller of the now-disassembled parts intended those parts to eventually become a complete weapon. Thus, the Seventh Circuit's choice of the word "disassembled" parallels its emphasis on the evidence of Lauchli's "intent to assemble." Accordingly, the choice of the word "disassembled" should not be regarded as an accident.[2]

The government brings to the court's attention two cases from other circuits, *United States v. Luce*, 726 F.2d 47 (1st Cir.1984), and *United States v. Endicott*, 803 F.2d 506 (9th Cir.1986), in which it was

held that, although there is no "combination of parts" or "readily restored to" language in the "silencer" definition, an "unassembled" silencer is a "firearm" within the statute. The government reads these cases as implying that the unassembled parts of a rifle constitute a "rifle" within the meaning of the Act. These decisions do not expressly discuss the prior history of the currently unassembled firearm parts involved in those cases. Without an explicit discussion of whether those parts had previously been assembled, or some holding that the prior history is irrelevant, these cases cannot stand for the proposition that never-before-assembled rifle parts are nevertheless rifles. That proposition, which is the issue here, simply was not raised in those cases.

Furthermore, it does not necessarily follow that just because the unassembled parts of a rifle may be tantamount to a "rifle," the never-before-assembled parts of a rifle also constitute a "rifle" within the meaning of the statute. A "rifle" is something "made, designed, and intended" to fire. It is understandable that a court could view something that happens to be currently unassembled *but was once* assembled as something "made, designed, and intended" to fire while *not* simultaneously regarding a never-before-assembled set of rifle parts as something "made, designed, and intended" to fire. In this court's view, it would be unduly stretching the coverage of the statute beyond its permissible meaning, especially in light of the maxim (with which the government agrees) that criminal statutes must be construed strictly, to ignore this distinction.

Finally, the government reargues its main contention from the first round of briefing on this question by stating that the constituent rifle parts in this case really can be "restored to fire" even though they have never been previously assembled. The reason, the government ex-

---

**2.** Even if one were to regard that choice as accidental, one could not expect the defendants to have known that what the Seventh Circuit really meant in *Lauchli* and *Shafer* was that unassembled and never-before-assembled rifle parts (and not just "disassembled" rifle parts) are "rifles" within the meaning of the statute. This relates to the issue of "fair notice" discussed later in this opinion.

plains, is that the rifle parts in this case must have been designed from a model or prototype of a rifle which itself must have at one time been fully assembled and proven operable. That prototype was then disassembled and used as a model for the parts that are subsequently produced. The government then concludes that even though the rifle parts in this case have never been assembled, they can still be "restored" to fire because the prototype of those parts was once fully assembled. However, there is no suggestion in the statute, administrative authority, legislative history or case law that the "readily restored to" clause vicariously applies to never-before-assembled rifle parts simply by virtue of some unidentified, previously assembled prototype rifle from which the rifle parts are derived. Therefore, the court rejects this argument.

Thus, the court concludes that the defendants here have been given no "fair notice" that their sales of never-before-assembled rifle parts were illegal. If anything, the revenue ruling, when considered along with the legislative history to the Gun Control Act of 1968, seems to support the defendants' view more than the government's. The same is true of *Lauchli* and *Shafer*. True, the cases the government cites do not expressly discuss the previous history of the firearm parts involved, and this might be taken as a sign that the previous history is irrelevant. It could thus be argued that those cases impliedly suggest that it does not matter whether rifle parts were previously assembled or not; either way they are rifles. However, such a reading of those cases would contravene the notion of "fair notice" discussed in the January 15 opinion. If a principle is not argued by the parties and decided by a court, or at least expressly stated in dictum, but instead is identified only as a possible, arguable reading of an opinion, then individuals have not been put on "fair notice" of a court's actual view. That is certainly the case here, where the cases the government cites simply do not discuss the relevance of the previous history of currently unassembled firearm parts to the scope of the firearms statute, nor have the

parties to those cases argued that relevance. Indeed, as the court has already stated, if anything, the revenue ruling and cases like *Lauchli* impliedly suggest that never-before-assembled rifle parts are not covered by the statute.

The government takes issue with the court's analysis of the requirement that criminal statutes must put a defendant on "fair notice" that his conduct is illegal. It appears that the government reads the January 15 opinion as requiring that the defendants in this case must receive actual notice of the illegality of their sales before prosecution is permitted. That is not this court's holding. Rather, "fair notice" simply requires that the criminal statutes be clear enough so that a person *could* determine that the conduct currently under prosecution is illegal, regardless of whether he actually did determine that.

The government also claims that this court overlooked the case law on § 5681 establishing that § 5681 is a "strict liability" offense. Specifically, citing to *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the government correctly but irrelevantly argues that the statute does not require proof that the accused knew that the firearm at issue was federally regulated. Again, no one in this case argues that such proof was necessary. Rather the defendants only argue that the statute must be clear enough to provide individuals with a fair opportunity to determine the criminality of their actions. *Freed* also stands for the proposition that "every person dealing in [firearms must] ascertain at his peril whether that which he sells comes within the inhibition of the statute." *Id.* at 609, 91 S.Ct. at 1118. The court also agrees with this, and there is no dispute in this case that defendants here, dealing as they did in rifle parts, were absolutely required to ascertain at their peril whether their dealings were prohibited by statute. The relevant question is whether the statute was clear enough to give the defendants a fair opportunity to ascertain the criminality of their conduct. It is this court's judgment that the firearms statute was not sufficiently clear to

inform the defendants, had they attempted to ascertain the meaning of the statute, that the statute actually prohibited the sale of unassembled, and never-before-assembled rifle parts. That due process requires criminal statutes to give people a fair opportunity to determine what constitutes a criminal act is of course beyond peradventure. *See United States v. Powell,* 423 U.S. 87, 92–93, 96 S.Ct. 316, 319–20, 46 L.Ed.2d 228 (1975); *United States v. Harriss,* 347 U.S. 612, 617–18, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954). However, in this case, not only is the statute itself unclear as to whether it covers the conduct the government wishes to prosecute, but the implementing revenue ruling and the interpretative cases do not shed any further light (at least not with any fair degree of precision) on this question. This is not fair notice.

Finally, the government cites cases, such as *United States v. Ross,* 458 F.2d 1144 (5th Cir.), *cert. denied,* 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972), and its progeny, as establishing that the definition of "destructive device," "silencer," and other types of firearms in § 5845 is not so vague as to be unconstitutional. None of those cases is pertinent here. Each of those cases merely holds that for the particular conduct charged therein, the applicable statutory provision was specific and clear enough to put the defendant on constitutionally adequate notice that his conduct was illegal. This case is different precisely because a person of common intelligence could not deduce that the conduct charged here was within the prohibition of the statute. That there are other cases charging defendants with different types of conduct for which fair notice was provided is not proof that in this case, where a different sort of conduct is alleged, the statute provided defendants with fair notice that their conduct was illegal.

The government concludes its request for reconsideration by raising "policy" arguments for the result it is urging. First, the government insists that if this court's January 15 decision is allowed to stand, there will be a loophole in federal firearms regulation inconsistent with Congress's in-

tent, since the ruling will permit gun traffickers to evade federal regulation by simply dealing in rifle parts which have never before been assembled. But the statute, as expressly written, already permits trading in "nonregistered," long-barrel rifles. Thus, it is clear that a person can now evade the federal regulations relating to the *sale* of short-barrel rifles (the conduct charged here) by simply selling long-barrel rifles to buyers who can then easily alter those rifles into short-barrel rifles by way of a hacksaw. The specter the government raises of unprecedented circumvention of an otherwise carefully drafted scheme regulating the sale of short-barrel rifles is therefore unrealistic given that the statute already permits possibilities for circumvention.

There is a further reason for why it is difficult to be impressed with the government's fears that dismissing these Counts will frustrate congressional intent. The law under which the government is prosecuting the defendants is not a provision of the federal Criminal Code. It is part of the Internal Revenue Code. If this prosecution were based on the Criminal Code, then it would be plausible to credit Congress with an intent to prohibit a broad range of gun-trafficking activities. But the law involved here is part of a revenue-producing code. As such, I am unwilling to defer to suggestions that this law is part of an overall scheme to reduce armed violence in this country. Instead, I insist that there be "fair clarity" in a statute which, though criminal, is part of an overall scheme to raise money for the government and only incidentally pertains to gun dealing.

The *Lauchli* case actually provides me with reason to believe that Congress did not intend § 5845 to apply to the constituent "parts" of a rifle, whether unassembled or disassembled. In a portion of the *Lauchli* decision which the government does not discuss, the Court assessed the validity of defendant's conviction under 15 U.S.C. § 901. This law, now repealed, was part of the Federal Firearms Act of 1938. Section 1 of that Act defined firearms as including "any part or parts" of any weap-

on designed to expel projectiles by the action of an explosive. See discussion at *Lauchli*, 371 F.2d at 313. Because of the "part or parts" language, the Seventh Circuit affirmed the conviction of the defendant based on his shipment of machinegun and rifle parts. *Id.* at 313–14. "[T]he District Court properly held [that such shipments] were within the broad reach of the Act as 'parts' of a weapon." *Id.* at 314.

Section 5845(c) (the "rifle" law relevant here) contains no "part or parts" language. It does not have the "broad reach" that the now-repealed 1938 Act had. But, as the 1938 Act's language reveals, when Congress wanted to cover constituent parts of a firearm, it knew how to say so. That Congress has not said so here is further evidence that § 5845(c) is not intended to cover the constituent parts of rifles, at least insofar as they have never been previously assembled.

The government's second "policy" argument is that this court's ruling places on the government an intolerable burden of proof. In order to prosecute a person who sells the constituent parts of a rifle, the government must now prove that those parts were at one time previously assembled into a complete rifle. This, the government maintains, will make prosecutions virtually impossible.

This is completely unsubstantiated. It is an assertion by government counsel without any evidentiary basis. More importantly, a court should not judicially rewrite a statute to alleviate some of the burdens of proof Congress has apparently chosen to place on the government.

If there is a "policy" argument relevant to this case, it is in favor of dismissing these Counts. The government's attempt to prosecute the defendants for the sale of unassembled and never-before-assembled rifle parts would seem to expand the reach of § 5845 to include a whole spectrum of activity which Congress plainly did not intend to regulate. For example, it is perfectly legal (as the government agrees) for a person to deal in long-barrel rifles. It is therefore also perfectly legal for a person to deal in long-barrel rifle parts. But a

person who deals in such parts, and also happens to possess independently a single short-barrel part (which is being used for some unrelated, innocent purpose) could be prosecuted under the government's view of § 5845. Since this dealer would be in possession of parts which could be combined into a short-barrel rifle, he would be vulnerable to a § 5845 prosecution. Contrary to *Lauchli*, it would not matter that the dealer never intended those parts to be assembled into a short-barrel rifle. It also would not matter that the dealer has never previously assembled those parts into a short-barrel rifle (from which an "intent" to assemble could otherwise be reasonably inferred). Thus, the government's view of § 5845 would seem to contravene Congress' own intent in limiting its regulation of gun dealing.

In summary, the court reaffirms its conclusion that the firearms statute did not provide the defendants with a fair opportunity for discovering that the sale of never-before-assembled rifle parts comes within the purview of the statute. No court has ever held that such rifle parts are within the purview of the statute. The statute itself does not expressly provide this. The sole, relevant revenue ruling on this subject does not state this, and given that the "readily restored to" language of the Gun Control Act of 1968 merely "restated" the effect of that ruling, it is likely that the ruling was only meant to cover only previously assembled rifle parts. Indeed, this seems to be the implication of the Seventh Circuit in *Lauchli* and *Shafer*. True, *Luce* and *Endicott* hold that unassembled firearm parts are tantamount to a firearm within the meaning of the law. However, those two cases were not presented with the question whether those currently unassembled parts must once have been assembled to come within the reach of the statute. Nor does the reasoning of those cases strongly suggest the result the government urges, especially in light of the doctrine that criminal statutes must be strictly construed. It is because the statute itself, the revenue ruling, and the Seventh Circuit cases have never spoken on this question and, if anything, they may even suggest

**614**

that previous assembly *is* a requirement, that this court must once again conclude that the defendants in this case had no "fair notice" of the criminality of the conduct that the government now seeks to prosecute.

### Conclusion

The government's motion to reconsider this court's January 15 opinion in which Counts I and III–VII of the indictment were dismissed is denied. In accordance with the government's request for thirty days in which to consider this opinion and determine whether or not to appeal, the case is set for status hearing on June 15, 1987, at 9:30 a.m. At that time the government should inform the court whether or not it will appeal the dismissal of these counts.

It is so ordered.