UNITED STATES of America,
Plaintiff/Appellee,

v.

Rex G. ENDICOTT,
Defendant/Appellant.

UNITED STATES of America,
Plaintiff/Appellee,

v.

John Stuart ROBERTSON,
Defendant/Appellant.

Nos. 85–3128, 85–3129.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1986.
Decided Oct. 27, 1986.

Gene S. Anderson, U.S. Atty., Andy Hamilton, Asst. U.S. Atty., Seattle, Wash., for plaintiff/appellee.

John Lundin, Terrence Kellogg, Seattle, Wash., for defendants/appellants.

Before POOLE, NORRIS and BEEZER, Circuit Judges.

POOLE, Circuit Judge:

Two codefendants, Rex G. Endicott and John S. Robertson, appeal their convictions for conspiracy to illegally receive, possess, transfer and import firearms and for substantive violations of federal firearms laws. We deal with each appeal separately.

## REX G. ENDICOTT

### FACTS AND PROCEEDINGS BELOW

In November, 1982, the Drug Enforcement Administration ("DEA") began an undercover investigation of the Bandido Motorcycle gang for suspected violations of federal narcotics laws. The investigation subsequently focused on possible violations of federal firearms laws. A DEA informant implicated Endicott, a licensed gun dealer running a firearms business out of his home, as a potential source of illegal guns. The DEA investigation culminated in the illegal transfer of a machinegun by Endicott to the informant on April 2, 1984. In 1984, the Bureau of Alcohol, Tobacco and Firearms ("BATF") began a separate investigation of suspected firearms violations. In the course of this investigation, an undercover informant, Dick Jones, purchased a machinegun and two undocumented pistols from Endicott.

On February 21, 1985, federal agents executed a search warrant at appellant's residence in Bellingham, Washington, seizing a machinegun and undocumented firearms. This warrant was issued on the basis of the affidavit of BATF Special Agent Robert Hausken. Hausken's affidavit drew on information provided by Jones, some of which is preserved on taped recordings of conversations between Jones and Endicott. Endicott made a pretrial motion to suppress the evidence obtained in the execution of the search warrant. After an evidentiary hearing, the district court denied the motion.

Endicott was convicted on seven counts of a twelve count indictment: conspiracy to illegally receive, possess, transfer and import firearms (Count I); knowingly transferring two machineguns without paying transfer tax and failing to comply with transfer provisions (Counts II and IV); failure to maintain proper records concerning the sales of two pistols (Counts III and V); illegal possession of a machinegun (Count VI) and illegal possession of a silencer (Count VII).

### DISCUSSION

Endicott challenges his convictions and sentences on the following grounds: (1) the district court erred in instructing the jury that a device may be a silencer even if unassembled; (2) evidence seized in the February 21st search of his home should have been suppressed because the search warrant affidavit contained misrepresentations and omissions; (3) the district court abused its discretion in sentencing Endicott; (4) the district court erred in instructing the jury that a firearms dealer must record the transfers of personal firearms and (5) the evidence was insufficient to support convictions on Counts II and IV.

### I. The Silencer Instruction.

Unassembled silencers were found in appellant's attic in the course of the February 21st search. The district court instructed the jury: "[y]ou may find that a device is a silencer although its parts are not assembled, if you find beyond a reasonable doubt that all of its component parts are readily available and only a brief and a minimal effort is required to assemble the complete design by reason of the nature and location of the parts." Endicott contends that this instruction was error because the statutory definition of a silencer does not include unassembled component parts. The Government responds that this interpretation of the definition of a silencer is supported both by Congressional intent and common sense.

As the district court's instruction involved the interpretation of a statute, it presents a question of law, which we review *de novo*. *United States v. Douglass*, 780 F.2d 1472, 1475 (9th Cir.1986); *United States v. Wilson*, 720 F.2d 608, 609 n. 2

(9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).

The National Firearms Act, 26 U.S.C. § 5845(a), provides: "The term 'firearm' means * * * (7) a muffler or a silencer for any firearm whether or not such firearm is included within this definition." Endicott argues that if Congress had intended this definition of a silencer to include its unassembled component parts, it would have so defined it in the statute. He points out that 26 U.S.C. § 5845(b) expands the definition of a machinegun by providing that "[t]he term 'machinegun' [includes] * * * any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b). He argues that since Congress did not use similar phraseology in the definition of a silencer, it is reasonable to conclude that Congress did not intend a silencer to include its unassembled parts.

This issue is one of first impression in our circuit. The First Circuit addressed this issue in *United States v. Luce,* 726 F.2d 47 (1st Cir.1984). In *Luce,* defendant challenged his conviction for possessing and transferring an unregistered silencer, putting forward the argument Endicott presses here. The trial court had given the jury the same instruction as the district court gave in the case at bar. The First Circuit rejected defendant's claim that this instruction was error and "agree[d] with the district court that Congress clearly intended this common sense interpretation" of the statutory definition. *Id.* at 49.

Congress clarified the reach of the National Firearms Act in 1954, emphasizing that it was directed, not at antique guns and their collectors, but at "such modern and lethal weapons * * * as could be used readily and efficiently by criminals or gangsters." H.R.Rep. No. 1337, 83rd Cong., 2nd Sess., (1954) *reprinted in* 1954 U.S.Code Cong. & Ad.News 4025, 4542. As the First Circuit stated in *Luce:*

"A person of common intelligence would recognize that a readily and easily assembled silencer serves no innocent purpose but is designed to facilitate the killing of another or to effectuate some other pernicious purpose by reducing the noise level of a fired weapon. [citation omitted] Under Luce's interpretation, a person could legally carry a silencer in two unassembled parts even though the two parts could be joined together within a few seconds and used to silence a lethal weapon. This would clearly frustrate Congress' intent to control the use of 'gangster-type' devices."

*Luce,* 726 F.2d at 49. We are persuaded by this analysis, and accordingly hold that the district court's instruction was correct.

II. Suppression of Evidence.

Endicott contends that his pretrial motion to suppress evidence seized in the search of his home should have been granted because of material omissions and misrepresentations in Agent Hausken's search warrant affidavit.

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court set forth the procedure for challenging the validity of a search warrant for omissions and misrepresentations. A defendant must make a substantial preliminary showing that the affidavits in support of the warrant contained intentionally or recklessly false material statements. If this preliminary showing is made, the court must then hold a hearing to examine the affidavits. The court must see if, excluding the misrepresentations, probable cause would exist on the basis of the remaining information. If, without the exclusions, probable cause is lacking, the search warrant is defective and the evidence seized thereunder is excluded. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

In this case, defendant Endicott was afforded the opportunity to make a preliminary showing of intentional or reckless material falsity at an evidentiary hearing. The district court found no evidence that Hausken intentionally, or with reckless disregard, misrepresented or omitted any facts in order to improperly secure a search

warrant, stating, "although the affidavits of Agent Hausken may have contained minor errors or omissions concerning the date of alleged conversations and/or the exculpating statements made by defendant Endicott, the affidavits were essentially an accurate presentation of the information known to the affiant." Having concluded that Endicott failed to show any intentional falsity or reckless disregard, and that any errors or omissions were "minor" (i.e., not material), the court had no occasion to reexamine the issue of probable cause.

We review the district court's factual findings as to intentional falsity or reckless disregard under the "clearly erroneous" standard. Fed.R.Civ.P. 52(a); *United States v. Ritter*, 752 F.2d 435, 439 (9th Cir.1985).

Appellant asserts the transcripts of taped conversations between informant Jones and Endicott, presumably available, along with BATF reports about the meetings, to Agent Hausken, demonstrate the intentional falsity or reckless disregard of Hausken's affidavit. After reviewing the excerpts of the transcripts provided by appellant, Hausken's affidavit and the motions made below, we conclude that the district court's finding was not clearly erroneous, and therefore we also do not reach the issue of probable cause.

### III. Endicott's Sentence.

■ The district court sentenced Endicott to two years in jail on Count I, two years on Counts II through VI to run concurrently with the sentence on Count I, a suspended sentence on Count VII, and three years probation. A codefendant, Bernard Warner, was given six months in jail (with a recommended work release) and five years probation. Endicott contends that his sentences represent an abuse of discretion because Warner was more culpable than he, and had been convicted of a felony in 1972 while Endicott had no prior criminal record.

■ It is within the discretion of the trial court to impose disparate sentences upon codefendants. *United States v.*

*Chiago*, 699 F.2d 1012, 1014 (9th Cir.), *cert. denied*, 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154 (1983). Further, "a disparity in the sentences imposed upon codefendants does not indicate that the sentencing judge has abused his discretion or that review is required." *United States v. Garrett*, 680 F.2d 650, 652 (9th Cir.1982). A sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review. *United States v. Tucker*, 404 U.S. 443, 446–47, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). *See also United States v. Hall*, 778 F.2d 1427, 1428 (9th Cir.1985); *United States v. Sand*, 541 F.2d 1370, 1378 (9th Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977).

■ Absent an infringement of defendant's constitutional right to stand trial, a district court judge is not required to explain the basis for disparate sentences, within statutory limits, imposed upon similar codefendants. *Hall*, 778 F.2d at 1428–29 (limiting *United States v. Capriola*, 537 F.2d 319 (9th Cir.1976), which required an explanation for the imposition of disparate sentences upon codefendants, to situations where defendant's constitutional right to stand trial is implicated). Here, all the sentences imposed upon the codefendants are within the statutory limits and no defendant's right to stand trial is implicated. Given the limited nature of review of this issue, we find the district judge did not abuse his discretion.

### IV. The Transfer of Firearms Instruction.

■ Endicott challenges his conviction for the knowing failure to make appropriate entries and maintain records regarding the sale of two pistols, in violation of 18 U.S.C. § 922(m). He contends that the district court erred in instructing the jury, "[a] licensed firearms dealer must record the sales of all firearms. This includes the sale of a firearm that was originally acquired for personal use."

This challenge to the interpretation of a statute is a question of law which we re-

view *de novo.* *Douglass,* 780 F.2d at 1475; *Wilson,* 720 F.2d at 609 n. 2.

■ 18 U.S.C. § 922(m) provides in pertinent part: "It shall be unlawful for any licensed * * * dealer * * * knowingly to make any false entry in, to fail to make any appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to § 923 of this chapter or regulations promulgated thereunder." Endicott contends the recording requirements apply only to a dealer's commercial inventory, not to firearms kept in the dealer's personal collection. This issue is one of first impression in this circuit. However, both the First and Seventh Circuits have dealt with this question.

In *United States v. Scherer,* 523 F.2d 371 (7th Cir.1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1108, 47 L.Ed.2d 315, (1976), the Seventh Circuit upheld defendant's conviction for violating firearms registration and recording requirements, rejecting his argument that he was not required to maintain records regarding the acquisition or sale of his personal firearms. The court wrote: "In the instant case it is immaterial whether the weapons sold were originally acquired for Scherer's personal use or for business purposes. They became a part of his business inventory the moment they were placed on the market for resale." *Id.* at 374.

In *United States v. Currier,* 621 F.2d 7 (1st Cir.1980), Currier, convicted of failing to maintain firearms transaction records with respect to sales, challenged the district court's instruction to the jury that the federal firearms regulations applied " 'even though the firearm is part of the dealer's personal firearms collection * * *.' " *Id.* at 9. Citing *Scherer* for support, the district court gave this instruction based on its reading of the statute. The First Circuit, in affirming, stated:

We see no merit whatsoever to appellant's argument on this point. The case relied upon by the district court is directly on point and held that it is immaterial whether firearms sold by a dealer were originally part of his personal or business inventory, since the moment they were offered for sale, the federal law applied. This holding is without doubt correct; otherwise, the federal regulations could be circumvented altogether by dealers who were slick enough to establish "personal collections" for otherwise unlawful sales.

*Id.*

The legislative history of the Omnibus Crime Control and Safe Streets Act speaks of the need to control the flow of firearms: "The ready availability; that is, ease with which any person can anonymously acquire firearms * * * is a matter of serious national concern." S.Rep. No. 1097, 90th Cong., 2nd Sess., *reprinted in* 1968 U.S. Code Cong. & Ad.News 2112, 2114. Although the legislative history states that Congress did not intend unnecessary regulation or hindrance of the personal ownership of guns, this interest is altered when the owner sells the gun, as Endicott did here. We agree with the First Circuit's analysis; it furthers Congress' intent to curtail illegal trafficking in firearms. Accordingly, we hold that the district court's instruction to the jury was not error.

## V. Sufficiency of the Evidence.

■ Endicott challenges his conviction for failure to comply with the transfer provisions of 26 U.S.C. § 5812(a) and failure to pay transfer taxes under 26 U.S.C. § 5811(a) in the course of transferring two machineguns. To prove appellant's violation of the transfer and tax provisions, the Government presented the testimony of Deron Dobbs, supervisor coordinator of the National Firearms Registration and Transfer Record in Washington, D.C. Relying on *United States v. Stout,* 667 F.2d 1347 (11th Cir.1982), Endicott argues that Dobbs was not competent to testify as to appellant's nonpayment of tax because tax stamps are issued by the District Director of the Internal Revenue Service, not BATF's Washington office. In *Stout,* defendant's conviction for nonpayment of taxes was reversed because the BATF custodian could not certify that the tax had not

been paid. This was on account of two problems with the BATF's records: (1) since IRS handled the payment of tax and the affixing of tax stamps to applications, BATF's records did not necessarily reflect the nonpayment of taxes, and (2) BATF did not keep records of pending applications. Dobbs testified that currently his office affixes the stamps and maintains records and that he had personally checked those records, finding that appellant had not complied with the statutory provisions. According to his testimony, application procedures have changed in such a way as to eliminate the problems presented in *Stout*.

Endicott did not object to Dobbs' testimony when it was offered, but first raised his challenge of sufficiency of the evidence in his motion for judgment of acquittal at the close of trial. Dobbs' testimony indicated he had personal knowledge of the matters on which he testified. *See* Fed.R.Evid. 602. In raising his sufficiency of the evidence objection after the fact, Endicott is really launching a belated attack on Dobbs' credibility—that is, whether his testimony was truthful. At the time, Dobbs' evidence was unchallenged. Endicott's objection should have been raised at the time of Dobbs' testimony. *See* 2 Wigmore, *Evidence* § 486, 643 (Chadborn rev. 1979). We therefore affirm Endicott's conviction on Counts II and IV.

## JOHN S. ROBERTSON

### FACTS AND PROCEEDINGS

John Robertson, a Canadian citizen, was convicted on two counts: conspiracy to illegally receive, possess, transfer and import firearms (Count I) and knowingly aiding and abetting the importation of thirty-three Polish military rifles (Count XII). At trial, witnesses testified that Robertson knew of and was involved in the sale of Polish rifles. Gary Trudo, a key witness for the prosecution, testified that Roberson sold him a Polish Mosin-Nagnant bolt action rifle at the Puyallup gun show in Washington. Trudo was not subpoenaed until the morning of June 27, 1985, and testified that afternoon after receiving a grant of immunity from the Government.

The district court denied Robertson's motions for judgment of acquittal or new trial and for arrest of judgment. On appeal, he contends: (1) prosecutorial misconduct served to deny him a fair trial, (2) the Government failed to provide *Brady* material, (3) the district court lacked subject matter jurisdiction over the cause, and (4) the evidence was insufficient to support a verdict of guilty.

## DISCUSSION

### I. Prosecutorial Misconduct.

Robertson advances two claims of prosecutorial misconduct: the Government improperly vouched for the credibility of its witness, Gary Trudo, and it injected an improper emotional appeal into its closing argument.

In its rebuttal argument, responding to its claim of an attack on Trudo's credibility because he had received immunity, a prosecutor argued, "[h]e was in fact granted immunity. That is an ordinary process by which we, the Government, is [sic] able to obtain testimony against people it regards as bigger, if you will, criminals * * *." The court sustained Robertson's objection, striking the statement and instructing the jury to disregard it. The prosecutor continued, "Immunity is a very ordinary process * * * Mr. Trudo wasn't grated [sic] immunity by some agent on the street at 10:00 in the morning. Agents don't have authority to do that. I granted him immunity along with Mr. Hamilton at noon." A second objection was sustained at this point. Robertson argues that these remarks led the jury to infer that the Government possessed other evidence, not presented to the jury, that gave it superior knowledge of Robertson's guilt.

Following the above objection, the prosecutor continued, saying, "[h]e was an honest person * * * Mr. Trudo, I suggest, was completely honest and credible with you." Although no objection was made to this

remark, the court reminded the jury that "counsel's argument is not evidence".

■ Prosecutorial comments to which defendant objects are reviewed for "harmless error", while the standard of review for comments which defendant failed to interpose an objection is "plain error". *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1045 n. 10, 84 L.Ed.2d 1 (1985). The *Young* standard was adopted by this court in *United States v. McKoy*, 771 F.2d 1207 (9th Cir.1985). The inquiry is whether allegedly improper behavior, considered in the context of the entire trial, including the conduct of the defense counsel, affected the jury's ability to judge the evidence fairly. *McKoy*, 771 F.2d at 1212. This standard allows some room for the Government's assertion that its remarks were in response to defense counsel's attacks. In *Young*, the Supreme Court dealt with the issue of "invited response" by examining the prosecutor's remarks to see if they simply " 'right[ed] the scale' " of justice. *Young*, 105 S.Ct. at 1045. After finding that the prosecutor's comments made in the course of closing argument did more than right the scale, the Court then reviewed for plain error because defendant did not object to the remarks. In *McKoy*, because defendant objected, we reviewed for harmless error.

■ We do not address the issue whether the prosecutor's comments simply righted the scale because we are convinced that the trial judge neutralized any potential harm of the remarks. A trial judge may cure the effect of improper prosecutorial comments "by admonishing counsel to refrain from such remarks or by giving appropriate curative instructions to the jury." *McKoy*, 771 F.2d at 1213; *see also United States v. Birges*, 723 F.2d 666, 672 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984). While the prosecutor did not profess personal knowledge of the truthfulness of Trudo's account, his remarks could possibly have indicated to the jury that the Government possessed additional information not available to the jury. However, the trial judge immediately took steps to neutralize the Government's remarks by reminding the jury that these remarks were but argument, not to be taken as evidence. His vigilance prevented any reasonable possibility of harm to Robertson.

■ Robertson also contends that the Government's references in its closing argument and on rebuttal to murders of prominent persons necessitate reversal. In its opening argument, the Government said in explaining the importance of firearms laws:

the usual situation is that they have a crime of violence, and they have a weapon, and they have to operate very quickly, and the only way to find out where that weapon came from is to go to this type of paperwork. And it is a trackable paper trail. Because if a dealer is like Rex Endicott, the trail is going to be nonexistent. I don't have to tell you about the people that have gotten killed by firearms. Some of the celebrities shot by firearms.

At this point, an objection was sustained. Nonetheless, in its closing rebuttal argument, the Government again referred to attacks on famous persons, saying, "[a]sk yourselves why it's necessary to trace a gun, what kind of guns you're tracing. John Hinkley comes to mind quickly." Again, the court sustained an objection and the prosecutor continued, saying, "[t]here are millions like that * * *." *Id.* Even if the trial court's corrective action was not as strong as it might have been, we do not believe these remarks were so prejudicial as to deny Robertson a fair trial. Counsel may be allowed some latitude in illustrating their arguments by reference to notorious or historical events without being automatically found to have committed irreparable prejudice. *Id.* The misconduct here lay in the prosecutor's almost stubborn insistence upon the disapproved analogy after the court had ruled that, in this context, the allusion was out of line. This was overzeal of the kind that neither side may be permitted. We find this conduct of the assistant United States Attorney censura-

ble, not because it was inherently excessive but because of the attorney's disregard for courtroom discipline and the court's rulings. The trial court might well have applied sanctions, but our role compels us to go no further than holding that this unprofessionalism nonetheless did not make the trial inherently unfair.

## II. *Brady* Material.

 *Brady* material is evidence both favorable to the accused and material to the issue of guilt or punishment. A defendant is denied due process if the Government suppresses *Brady* material. *United States v. Dupuy,* 760 F.2d 1492, 1501 n. 3 (9th Cir.1985). Robertson raised his *Brady* claim in his motion for a new trial, which the district court denied. We review the district court's denial of Robertson's motion for a new trial for abuse of discretion. *United States v. Shaffer,* 789 F.2d 682, 687 (9th Cir.1986) *United States v. Steel,* 759 F.2d 706, 713 (9th Cir.1985).

 Robertson contends that the Government did not release all the documents seized in its search of codefendant Bernard Warner's home, some of which would call into question Gary Trudo's credibility. Trudo testified that Robertson sold him a Polish rifle at the Puyallup gun show in Washington. Testimony indicated that the shows are held monthly. Although Trudo wavered on the date of the sale, he appeared to claim it took place at the December show. Robertson maintains he was in Texas at the time of the December show, and that the Government seized receipts corroborating his account of his travels during the time period in question, but did not put them in evidence nor release them to him. The Government responds that it provided documentation to Robertson in discovery which included his hotel receipts, and that no other evidence exists. Appellant offers no support that there is evidence other than his bald assertion that Warner told him, after the trial's conclusion, that additional exculpatory documentary evidence had been seized in the search but not made available to Robertson. Given Robertson's bare assertion that this evidence exists, we do not find that the district court abused its discretion in denying this motion.

## III. Subject Matter Jurisdiction.

 Robertson argues that the district court lacked subject matter jurisdiction over this case because some of the acts occurred outside the United States. Because jurisdiction is a question of law, our review is *de novo. Peter Starr Production Co. v. Twin Continental Films, Inc.,* 783 F.2d 1440, 1442 (9th Cir.1986).

 United States jurisdiction extends to acts occurring outside its territory if those acts are intended to produce detrimental effects in the United States. *Chua Han Mow v. United States,* 730 F.2d 1308, 1312 (9th Cir.1984), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985). Any conspiratorial act occurring outside the United States is within United States jurisdiction if an overt act in furtherance of the conspiracy occurs in this country. *United States v. Davis,* 608 F.2d 555, 556–57 (5th Cir.1979). This jurisdiction also extends to acts which are not in themselves illegal. *United States v. Brown,* 549 F.2d 954, 956 (4th Cir.), *cert. denied,* 430 U.S. 949, 97 S.Ct. 1590, 51 L.Ed.2d 798 (1977). Robertson was charged with, and convicted of, involvement in a conspiracy intended to have detrimental effects in the United States. He challenges jurisdiction claiming that the testimony of witnesses of his involvement in the conspiracy was insufficient to warrant the district court's exercise of extraterritorial jurisdiction. His argument is simply an attack on the credibility of witnesses, and as such, fails. The district court had jurisdiction over this cause.

## IV. Sufficiency of the Evidence.

 Robertson argues that there was insufficient evidence to support a verdict of guilty. In examining the sufficiency of the evidence, we ask "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could

have found the defendant[ ] guilty beyond a reasonable doubt of each essential element of the crime charged." *Douglass,* 780 F.2d at 1476.

Robertson's claim of insufficiency launches an attack on the credibility of the Government's witnesses. In reviewing for sufficiency of the evidence, this court "must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *United States v. Ramos,* 558 F.2d 545, 546 (9th Cir.1977). We find the evidence sufficient to support a verdict of guilty.

The judgments of conviction are AFFIRMED.

NORRIS, Circuit Judge, concurring in part and dissenting in part:

I concur in all aspects of the majority opinion with respect to Endicott's conviction. I must dissent, however, from the majority's unsupported assertion that, in a trial for violations of the Gun Control Act, the "latitude" permitted a prosecutor in closing argument encompasses inflammatory references to political assassination and murder. As evidence of Robertson's guilt was less than overwhelming and as the trial court took only mild corrective action judged in relation to the prosecutor's grossly excessive rhetoric, I would reverse Robertson's conviction on the ground of prosecutorial misconduct and remand for a new trial.

The majority properly finds censurable the prosecutor's repeated references to "celebrities shot by firearms" and his plea that the jury "ask [them]selves ... why it is necessary to trace a gun, what kinds of guns you're tracing. John Hinckley comes to mind." Even after the trial court sustained a defense objection to the latter remark, the prosecutor immediately continued: "[T]here are millions like that." However, the majority analyzes the misconduct solely in terms of the prosecutor's disregard for courtroom discipline and the court's rulings. Neither analysis nor citation supports the majority's assertion that remarks conjuring up the emotionally supercharged images of the assassinations of President Kennedy, Senator Kennedy and Martin Luther King; the murder of John Lennon; and the attempted assassination of President Reagan were not "so prejudicial as to deny Robertson a fair trial."

I disagree. Such remarks serve no purpose other than to "inflame the jury to act as the conscience of the community," *United States v. Ledezma-Hernandez,* 729 F.2d 310, 314 (5th Cir.1984), *see also United States v. Lester,* 749 F.2d 1288, 1301 (9th Cir.1984), and "divert the jury from its duty to decide the case on the evidence by injecting issues broader than guilt or innocence" into the trial. *United States v. Perez,* 491 F.2d 167, 174 (9th Cir.), *cert denied,* 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974).

When a prosecutor indulges in such excessive and overzealous conduct, it is our duty to inquire whether "the behavior, considered in the light of the whole trial ... affected the jury's ability to judge the evidence fairly." *United States v. McKoy,* 771 F.2d 1207, 1213 (1985), *citing United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985). Applying a harmless error test, the court must consider whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial, *id.,* considering both the prejudice to the defendant and whether or not the prejudice was cured by the trial judge. *See United States v. Potter,* 616 F.2d 384, 392 (9th Cir.1979); *United States v. Mikka,* 586 F.2d 152, 155 (9th Cir.1978); *United States v. Parker,* 549 F.2d 1217, 1222 (9th Cir.) *cert. denied,* 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977).

Here, evidence of Robertson's guilt, which largely depended on the credibility of one government witness, was not so compelling that a jury might not have been swayed by the prosecutor's diversionary tactics. Moreover, where such inflammato-

**516**

ry references are used, neutralization of the prejudice may require the trial judge to do more than sustaining a defense objection or reminding the jury that counsel's arguments are not evidence. (*See United States v. Segna,* 555 F.2d 226 (9th Cir.1977) (reversible error where prosecutor misstated law on insanity defense so as to shift burden of proof to defendant even though the law was properly stated in defense argument and in instructions to jury).) Such spectres, once invoked, are not so easily laid to rest.

Our courts should not tolerate a prosecutor's use of cultural nightmares to enhance the odds of a conviction. I would reverse Robertson's conviction and remand for a new trial.