UNITED STATES of America,
Plaintiff–Appellant,

v.

Gerald DRASEN, Anthony Aleo, and
Cynthia Aleo, Defendants–Appellees.

No. 87–1964.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1987.

Decided April 29, 1988.

Rehearing and Rehearing En Banc
Denied July 5, 1988.

Lawrence E. Rosenthal, Asst. U.S. Atty., Chicago, Ill., Anton R. Valukas, U.S. Atty., for plaintiff-appellant.

Paul J. Petit, Betar & Petit, P.C., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, WOOD, Jr., and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This is an interim appeal [1] by the government from the dismissal of six counts of a fourteen-count indictment. The first count charged the defendant Gerald Drasen, aided and abetted by defendants Anthony Aleo and Cynthia Aleo, with engaging in business as a dealer in rifles having barrels

---

1. Jurisdiction rests on 18 U.S.C. § 3731 (1982), which permits a government appeal from a dis-  trict court decision dismissing one or more counts of an indictment.

of less than sixteen inches in length without having paid the special occupational tax required by 26 U.S.C. § 5801, and without having registered with the Secretary of the Treasury as a dealer as required by 26 U.S.C. § 5802, in violation of 26 U.S.C. § 5861(a).[2] Counts three through seven charged defendants Anthony Aleo and Cynthia Aleo, aided and abetted by defendant Gerald Drasen, with transferring five different firearms, all having barrels of less than sixteen inches, in violation of 26 U.S.C. § 5845.

## I. THE ISSUE

The defendants in this case were not dealing in assembled rifles, but were selling complete rifle parts kits. The government conceded during discovery that all of the short-barrel rifles involved were unassembled when the defendants sold and transferred them. The indictment was predicated upon the government's theory that the simultaneous transfer of the unassembled constituent parts of a short-barrel rifle constituted the transfer of a "rifle" within the meaning of 26 U.S.C. § 5845, in violation of 26 U.S.C. § 5861(e).[3] The defendants moved to dismiss six counts on the basis that the statute did not cover unassembled rifles that had never been assembled. The district judge so held and dismissed these counts. 665 F.Supp. 598. The question, therefore, is whether or not the unassembled and never previously assembled constituent parts of a rifle, which might or might not be assembled to form a short-barrel rifle, are in fact a short-barrel rifle within the meaning of the National

Firearms Act, 26 U.S.C. § 5845 (1982) (the Act). The government claims that assembled and unassembled rifles are the same under the statute, but the defendants argue that the statute excludes parts of previously unassembled rifles.[4] The issue distilled from this situation is easier to state than to decide: we must determine the meaning of the statutory term "rifle" under the National Firearms Act. The place to begin and end is with the statute and its legislative history.

## II. OVERVIEW

Section 5845(a)(3) defines "firearm" to include "a rifle having a barrel ... of less than 16 inches in length." "Rifle" is defined in section 5845 as follows:

The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

26 U.S.C. § 5845(c) (1982).

The government reads that provision to include a complete rifle parts set, which it claims is the functional equivalent of an assembled firearm. The government argues that it is "only natural that Congress would have wanted to regulate all devices 'designed ... made ... and intended' to operate as short barrel rifles, and a parts set surely meets that definition." According to the government, a 1954 ruling by the

---

**2.** 26 U.S.C. § 5861(a) makes it illegal for persons to deal in firearms without paying the special occupational tax required by 26 U.S.C. § 5801 or registering the firearms as required by 26 U.S.C. § 5802.

The counts remaining and not involved in this appeal relate to transfer of a machine gun conversion kit, possession of various machine gun receivers, and the possession of a machine gun receiver not identified by serial numbers. A superseding indictment was returned and is also not involved in this appeal. The superseding indictment does not affect our review of the original indictment. It is well established that two indictments may be outstanding at the same time for the same offense if jeopardy has not

attached to the first indictment. The government may then select the indictment under which to proceed at trial. *See United States v. Stricklin,* 591 F.2d 1112, 1115–16 n. 1 (5th Cir.) (collecting cases), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); 9 Federal Procedure § 22:463 (L.Ed.1982).

**3.** 26 U.S.C. § 5861(e) provides that it is unlawful to transfer a firearm in violation of the Act.

**4.** We note the filing of an amicus curiae brief in support of the defendants' position by Larry E. Craig, a member of Congress, joined in by Senators Orrin E. Hatch and James A. McClure.

Commissioner of Internal Revenue issued before Congress added the "readily restored to fire" language to the statute supports the government's view. The government argues that in the 1968 amendment to the Act, Congress stated its intention to endorse that administrative construction. Even though the government's statutory interpretation has some difficulty in accommodating the "readily restored" language, the government contends that, contrary to the district court's view, the statute nevertheless provided fair notice to the regulated firearms industry as to what is or is not unlawful. The government also argues that the defendants could have inquired to determine whether they were acting within the law.

The defendants' response is simply that a previously unassembled collection of rifle parts sold as a kit, although ready for assembly into a functioning rifle, does not violate the Act provisions requiring licensing and registration of certain rifles. The defendants find unsupportable the government's theories that the complete collection of parts in a kit is the functional equivalent of an assembled weapon and that the Act reaches a previously unassembled weapon that can be readily assembled. Furthermore, the defendants argue that we should construe an ambiguous criminal statute in favor of the defendants.

Applying the facts of this case, the statute on its face is not clear. Each of the parties therefore has some difficulty supporting their respective positions. Considering the statutory definition of "rifle" set out in section 5845(c), it is apparent that to clarify the statute little additional language would have been needed to accomplish what the government claims Congress intended. The statute could have defined a rifle as also including the parts thereof that could be readily assembled to form a functioning weapon. The omission of some clarifying language does not mean, however, that a reasonable interpretation of the statute does not yield the same result.

### III. ANALYSIS

■ The rifle kits at issue are not a sackful of miscellaneous parts that an ordinary person could not easily sort out and assemble into a functioning rifle. The parts kits here are composed of major rifle sections already assembled, leaving only a few of the assembled sections to be quickly and easily slipped into position so as to be ready to fire. The government would have a more difficult task in claiming that a collection of totally separate parts, all unassembled and mixed, was the equivalent of a functional rifle. If the rifle parts kit is largely assembled, but not quite, the government may have an easier task. There are other complicating possibilities. A parts kit might not be totally complete, unlike the kits at issue. One part could be omitted. The rifles, therefore, would not function, but that one part might be available at a shop next door.

The statutory language "readily restored" is somewhat ambiguous. That language suggests, as the defendants argue, that if the rifle had previously been assembled, although now in a parts kit, it would be within the statute. The statute, therefore, would not cover rifle parts never before assembled into a functioning rifle. If, then, the seller demonstrated for a purchaser how easily a rifle could be assembled from a previously unassembled kit, and then disassembled the rifle and put it back in the kit for sale, all are in agreement, it appears, that the statute would cover that particular kit. There are other hypothetical possibilities, but it is clear that the statute's intended meaning is not as readily discernible as could be desired.

The term "make," used in section 5845(c), is defined in section 5845(i):

The term "make," and the various derivatives of such word, shall include manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a firearm.

26 U.S.C. § 5845(i) (1982). This definition suggests that, to produce a firearm, "putting together" the parts is necessary. Thus, if the parts have never been put together, the defendants argue that no fire-

arm has in fact been made. According to the government's interpretation, however, what is "made" need not be a weapon ready to fire at that moment; the parts merely need be "capable of being made into" a weapon. The defendants argue that manufacturing parts is only one step in the production of a weapon. Even after the rifle parts have been manufactured, the rifle is not complete until the parts are assembled so that the rifle is ready to be fired. The defendants analogize that a car is not a car until it rolls off the assembly line ready to drive away.

The government suggests that the district court's and the defendants' statutory interpretation would allow criminals to legally possess short-barrel rifles in a disassembled state even though it might take very little assembly to make a functional rifle. The defendants' response is that the district court confined its ruling to rifle kits that had never, even temporarily, been assembled into functioning rifles. If the buyer of the kits does the assembling, then the buyer, not the dealer or manufacturer, would be the one required to register the rifle and pay the applicable tax. If that particular rifle were then disassembled, although capable of being readily restored to firing condition, the statute would still apply. The defendants' explanation is not the way Congress intended the statute to work.

A parts kit cannot fire a fixed cartridge, nor can the unused parts be readily "restored" to fire a fixed cartridge if "restored," as the defendants argue, means to return to a previous condition. In the defendants' view, assembling a previously unassembled parts kit would not be a restoration, but the original creation of a rifle. This would allow rifle dealers and manufacturers to use parts kits to take advantage of a possible statutory loophole. That supposed loophole, however, would be difficult to ascribe to any conscious and reasonable legislative purpose. If the so-called loop-

hole was intentional, then Congress's reasoning escapes us. We shall consider and weigh the opposing arguments.

The government points out that the statute contains no specific requirement that a "rifle" must be assembled and functional for the statute to apply. The defendants argue that the statutory use of the words "weapon" and "made" imply that a parts kit, which is not functional, cannot be considered a "weapon." The government responds that when the parts have been manufactured and placed in kits the rifle is as "made" as a completed rifle. A parts kit qualifies as a weapon under the statute because it has been "designed," "made," and is "intended" for use as a weapon. To bolster its argument, the government contends that any doubt about a parts kit being a weapon is eliminated by the last clause of section 5845(c), which includes rifles that can be "readily restored" to operability, drawing a difference from the use of that language than do the defendants.

The government further argues that the present statutory definition of "rifle" has its origin in the National Firearms Act of 1954, which was substantially the same as the present statute except that the "readily restored" language of the current law was not included.[5] The 1954 legislative history is of no help to either party, but the government relies upon a formal ruling of the Commissioner of Internal Revenue issued in conjunction with the 1954 Act. The ruling provided:

> The possession or control of sufficient parts to assemble an operative firearm constitutes the possession of a firearm, and the transfer of sufficient parts to assemble an operative firearm constitutes the transfer of a firearm subject to the transfer tax.

Rev.Rul. 54–606, 1954–2 C.B. 33. That ruling, the government argues, did not receive

---

5. The 1954 statute provided:
   The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic

cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.
1954 I.R.C. § 5848(3) (as amended by Pub.L. No. 85–859, tit. II, § 203(f), 72 Stat. 1427 (1958)).

the deference from the district court to which it was entitled. *See National Muffler Dealers Ass'n, Inc. v. United States,* 440 U.S. 472, 488, 99 S.Ct. 1304, 1312, 59 L.Ed.2d 519 (1979). Therefore, the government asserts that we should accept that ruling and not interpret the ruling restrictively.

The district court, however, had some reservations about the ruling's applicability since the ruling did not mention the previously assembled or readily restored possibilities now in the statute. The Commissioner's ruling, however, was broad and all-encompassing. It plainly states that the statute applies if a person possesses or transfers sufficient parts to assemble an operating firearm. That ruling did not amend the statute, but was in keeping with the common sense interpretation of the statute. The ruling was unaffected when Congress later added the "readily restored" language to the statute. Whether the parts are to be assembled or reassembled is of no practical consequence since a functional rifle is the result in either event. Common sense permits no other conclusion.

The government relies in part on *United States v. Lauchli,* 371 F.2d 303 (7th Cir. 1966), and also on *United States v. Kokin,* 365 F.2d 595 (3d Cir.) (per curiam), *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed. 2d 448 (1966), to support its view that the Commissioner's formal ruling in construing section 5845(c) to reach "sufficient parts to assemble an operative firearm" is dispositive of this case. In *Lauchli* we were concerned with the sale of machine gun parts under the earlier 1934 Act. Some of the machine guns were assembled at the time of sale, some were not. We took note of the Commissioner's ruling, but found it unnecessary to apply the ruling to the particular facts of that case because the purchaser had demanded operable machine guns and some were assembled at random to demonstrate that all the guns were or would be operable. Whether those machine guns had previously been assembled was not an issue because the statute did not yet contain the "readily restored"

clause. We held that the transaction involving all the machine guns was within the 1934 Act.

In *Lauchli,* 371 F.2d at 313, we relied on *Kokin,* a case involving a factual situation similar to *Lauchli.* *Kokin* held that the transfer of firearm parts constituted a violation of the 1934 Act because assembly was contemplated by the buyer. The seller assisted in the assembly of some of the firearms.

The government cited other cases indicating that the Act covers firearms even though they are not fully assembled. For example, in *United States v. Woods,* 560 F.2d 660, 664–65 (5th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed. 2d 497 (1978), the Fifth Circuit held that a short-barrel shotgun as defined in 26 U.S.C. § 5845(d), which was in two parts, was within the Act. Section 5845(d) contains the same "readily restored" phraseology. The court did not require proof of previous assembly, but the facts did suggest that one shotgun had been previously assembled. Thus, *Woods* did not reach the exact issue we are concerned with here.

In *United States v. Catanzaro,* 368 F.Supp. 450, 452–53 & n. 3 (D.Conn.1973), the court held that a shotgun with broken or missing parts was within the Act because new parts were readily available from the factory. The shotgun at issue was made up of both old and new parts. New or old was immaterial, however, because a functional shotgun could be readily assembled or reassembled (depending on how one views the addition of new parts). While these cases do not reach the exact issue before us, they illustrate the general unwillingness of courts to interpret the Act in an unduly restrictive manner.

In *United States v. Endicott,* 803 F.2d 506, 509 (9th Cir.1986), and *United States v. Luce,* 726 F.2d 47, 48–49 (1st Cir.1984), the courts of appeals interpreted 26 U.S.C. § 5845(a) to include not only an assembled silencer, but also a silencer's unassembled component parts. Section 5845(a) does not contain either "combination of parts" or

"readily restored" language.[6] Nonetheless, the courts employed a common sense approach to find that the statute covered unassembled silencers.

This court has also adopted a common sense approach to interpreting the National Firearms Act. In *United States v. Shafer,* 445 F.2d 579 (7th Cir.), *cert. denied,* 404 U.S. 986, 92 S.Ct. 448, 30 L.Ed.2d 370 (1971), we held that under 26 U.S.C. § 5845(f), grenade shells, fuses, and powder were to be considered a firearm even though disassembled because the statute did not expressly apply only to assembled firearms. To construe the Act otherwise, we held, would destroy the flexibility of the applicable provision and sanction evasion of congressional intent.

Section 5845(c), dealing with rifles, also allows some flexibility because it covers weapons designed or redesigned, made or remade, and intended to be fired from the shoulder. The additional language "and shall include a weapon which may be readily restored" should not be read so as to change the statute and the Commissioner's ruling to mean either that the rifle must be fully assembled, or if not, must have been previously assembled and could be reassembled. A rifle that has been disassembled for some reason is clearly in the same category as an identical collection of rifle parts that has not yet been assembled. The statute covers both. The added clause should not be read to change the meaning of the statute as written and interpreted.

Congress, in adopting the 1968 reenactments of the statutory definitions found in the 1954 Act, intended to adopt "the administrative construction of existing law."[7] That would include the Commissioner's ruling clarifying the statutory language. Congress gave no indication that it adopted the "readily restored" clause to add some unexplained exception to the prior administrative construction. In *United*

*States v. Board of Comm'rs,* 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978), the Supreme Court held that when Congress, in reenacting a statute, voices its approval of an administrative or other interpretation, that interpretation is treated as if Congress expressly adopted it. Therefore, the interpretation continues to be binding on the courts.

In adding the "readily restored" clause, Congress specifically intended to overcome *United States v. Thompson,* 202 F.Supp. 503 (N.D.Cal.1962), holding that a firearm with a missing firing pin was not a firearm under the Act.[8] In reacting to *Thompson,* Congress did not intend to greatly narrow existing coverage; the amendment was added to make clear that the Act's coverage is broad. The particular parts kits at issue here, even if containing all new and previously unassembled parts, were identical to parts that had been incorporated into many other functional rifles ready to fire. The defendants do not claim that the kits contained experimental parts not previously tested in prototype models. The parts in these kits are indistinguishable from parts in another kit or from parts fully assembled into a complete rifle. There is no sound reason for conjuring up a nonsensical statutory distinction unsupported by a reasonable interpretation of the statute and its legislative history. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982). We find absolutely no justification to read the statute as restrictively as the district court did, taking it beyond the bounds of reason and common sense.

The defendants also endeavor to extract a favorable meaning from the statute apart from the "readily restored" language. To be a rifle an object must first be a "weapon," and a mere collection of parts cannot be a weapon. The weapon also has to be "made" as defined in section 5845(i). The

---

6. The defendants point out that Congress subsequently enacted a statutory definition of a silencer that includes a "combination of parts" clause. *See* 18 U.S.C. § 921(a)(24) (Supp. IV 1986). Congress, however, did not amend 26 U.S.C. § 5845(a), the statutory provision at issue in *Endicott* and *Luce.*

7. S.Rep. No. 1501, 90th Cong., 2d Sess. 46 (1968), U.S.Code Cong. & Admin.News 1968, p. 4410.

8. *Id.*

defendants would read this definition restrictively to exclude a complete or unassembled parts kit. We read the statute as encompassing a complete parts kit ready to be assembled, at least by giving meaning to the language "otherwise producing a firearm." Thus, we find no merit in the defendants' argument.

■ The defendants also claim that, in any event, they were not selling short-barrel rifles since each kit included a flash suppressor that, if attached to the barrel, would extend the barrel beyond the regulated length. A flash suppressor, which has limited legitimate use apart from the military or police, is not an essential part of a rifle. A rifle fires accurately without it. A flash suppressor is an optional attachment that can be screwed to the end of the barrel. It is no more a part of the barrel than the rifle stock attached to the opposite end of the barrel. Federal regulations outline how to measure a barrel from its muzzle, which would exclude any removable attachment on the end of the muzzle. *See* 27 C.F.R. § 179.11 (1987). If a flash suppressor is permanently affixed to a barrel it may be counted in measuring barrel length, Rev.Rul. 55–570, 1955–2 C.B. 481, but that is not the present case. Thus, the flash suppressors here did not add to the barrel length of the rifles.

The defendants also argue that where Congress intended a firearms statute to encompass a parts kit, it used the words "combination of parts" as it did for the definitions of machine guns, 26 U.S.C. § 5845(b); mufflers and silencers, 18 U.S.C. § 921(a)(24); and "destructive devices," 26 U.S.C. § 5845(f). Pointing out the absence of such language in the definition of a rifle, the defendants would have us draw the conclusion that for some inex-

plicable reason Congress intended to distinguish short-barrel rifles. The present case is not concerned with miscellaneous parts for machine guns and destructive devices. Parts for those weapons, which are regulated without limitation, are therefore parts with only one purpose, so that a single part could reasonably be subject to regulation. Parts for rifles, on the other hand, encompass many parts for many unregulated rifles. Therefore, a clause encompassing any combination of parts for a rifle would be inappropriate because it would include parts for unregulated rifles. We are concerned only with complete parts kits for short-barrel rifles. The defendants' comparisons of statutory sections are to no avail.

■ The defendants also claim that the statutory framework is too vague as applied to parts kits. The statute easily could be clearer, but a common sense reading of the statute, combined with the Commissioner's ruling, provides sufficient clarity. The government relies on *United States v. Freed*, 401 U.S. 601, 609–10, 91 S.Ct. 1112, 1118–19, 28 L.Ed.2d 356 (1971) (quoting *United States v. Balint*, 258 U.S. 250, 253–54, 42 S.Ct. 301, 302–03, 66 L.Ed. 604 (1922)). *Freed* involved the possession of unregistered hand grenades. Because of the dangerous nature of such devices, the Court shifted the burden to the person dealing in the items to ascertain at his peril whether his activities were within the statute. The defendants in the present case surely knew that they were in a highly regulated business and therefore bore some of the responsibility for ascertaining whether parts kits are regulated. *See United States v. Biswell*, 406 U.S. 311, 315–16, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972).[9] It is sound advice for those in

9. We share Judge Manion's concern, expressed in his dissent, that defendants should receive fair notice that their conduct is illegal. Nevertheless, we believe that the defendants here could easily have ascertained the illegality of their conduct, if not already known to them, by making an inquiry into the applicable firearms regulations. In addition, the fact that the defendants were dealing in a highly regulated field, *see United States v. Biswell*, 406 U.S. 311, 315–16, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87

(1972), reduces the fair notice concern. *See Freed*, 401 U.S. at 609–10, 91 S.Ct. at 1118–19; *see also Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) ("[B]usinesses ... can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry....") (footnote omitted); W. LaFave & A. Scott, Criminal Law 92–93 (2d ed.

such a regulated business to make a fair and reasonable determination about the status of their activities, not merely a self-serving and hopeful one.

The defendants rely on the principle that ambiguous criminal statutes should be construed in favor of leniency. *United States v. Bass*, 404 U.S. 336, 347–49, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971). Nevertheless, we recently held that the principle of lenient construction does not require a court to ignore the obvious intention of the legislature in enacting the statute. *United States v. Kenngott*, 840 F.2d 375, 383–84 (7th Cir.1987). As noted in *United States v. Luce*, 726 F.2d 47 (1st Cir.1984), "[t]he National Firearms Act was designed to regulate the manufacture, possession, and transfer of 'modern and lethal weapons ... [that] could be used readily and efficiently by criminals or gangsters'." *Id.* at 49 (quoting H.R.Rep. No. 1337, 83d Cong., 2d Sess. (1954), *reprinted in* 1954 U.S.Code Cong. & Admin.News 4025, 4542). The interpretation we apply is the only interpretation consistent with that congressional purpose. Thus, the defendants were not deprived of fair warning that their transactions in short-barrel rifles would violate the Act.

The defendants have been ably represented, but we find no merit in the particular arguments we have addressed or the related or other arguments that the defendants advanced.

Reversed and remanded for such additional proceedings as may be appropriate. No costs shall be assessed in this court.

MANION, Circuit Judge, dissenting.

I agree with the district court that § 5845 did not give the defendants fair notice that their conduct was illegal. Therefore, I respectfully dissent. Since the district court has thoroughly analyzed the issue in a published opinion, *United States v. Drasen*, 665 F.Supp. 598, 599–604, 607–14 (N.D.Ill.1987), I will add only a brief comment.

I have no quarrel with the majority's observation that a person dealing in a highly regulated activity such as selling firearms must ascertain whether his activities are, in fact, regulated. *Supra* at 737–38. But that observation begs the question. I am willing to assume that the defendants made no attempt to determine whether selling the parts kits was illegal; the question we face, though, is whether, if the defendants had inquired, the statute would have fairly informed them that selling the parts kits was illegal.

The government is attempting to prosecute the defendants for selling a "combination of parts." However, where Congress intended to regulate combinations of parts, it did so precisely and explicitly. For example, the definition of "machinegun," § 5845(b), includes "combination of parts" language. Contrary to the government's assertion (which the majority appears to have accepted, at 737), the "combination of parts" language does not simply refer to "any" part. The definition of "machinegun" also includes "*any part* designed and intended solely and exclusively ... for use in converting a weapon into a machinegun...." If the "combination of parts" language was sufficient to regulate "any" part, the "any part" language would have been unnecessary. The definition of "machinegun" shows that when Congress wanted to regulate combinations of parts, or "any" parts, it knew how to do so with precision. Congress has not included such precise language in the definition of rifle.

Furthermore, I would not rely on Rev. Rul. 54–606 (issued in 1954) to clarify the definition of rifle and impose criminal liability on the defendants. Revenue rulings do not have the force of law; they represent only the IRS' opinion of the law. *See Flanagan v. United States*, 810 F.2d 930, 934 (10th Cir.1987). More importantly, it is not even clear from the legislative history of the 1968 Gun Control Act that Congress intended to adopt Rev.Rul. 54–606. Al-

1986) (where defendant engages in regulated trade, requirements for fair warning are less stringent).

though Congress stated that it intended to adopt "the administrative construction of existing law," Congress did not mention the revenue ruling. Nor did Congress even mention its understanding of the administrative construction it said it was adopting. Thus, *United States v. Board of Commissioners,* 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978), cited by the majority, at 736, is inapposite: in that case, the legislative history of the re-enactments in which Congress adopted an administrative construction contained ample evidence that Congress knew exactly what the administrative construction was that it was adopting. *See* 435 U.S. at 132–35, 98 S.Ct. at 979–81. Besides, *United States v. Board of Commissioners* was not a criminal case involving fair notice.

Perhaps the majority's construction of § 5845 is the "common sense" interpretation of that section; perhaps the majority's construction is what Congress actually intended. But Congress did not express that intent clearly enough to provide fair notice to these defendants that their acts violated the law. As the majority admits, "to clarify the statute little additional language would have been needed to accomplish what the government claims Congress intended. The statute could have defined a rifle as also including the parts thereof that could be readily assembled to form a functioning weapon." *Supra* at 733. But Congress did not include such language. We should not impose criminal liability based on imprecise statutory language, or on an old and obscure revenue ruling that Congress did not even mention in legislative history. Fair notice means that people should not have to speculate on how Congress (or a court) applies "common sense" when determining whether conduct is illegal. The district court correctly dismissed the six counts of the 13–count indictment dealing with the sales of the short-barrel rifle parts kits.