**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sherard Dale BROWN, Defendant–
Appellant.**

**No. 95–2671.**

United States Court of Appeals,
Seventh Circuit.

Argued April 30, 1997.

Decided June 26, 1997.

Frances C. Hulin, Timothy A. Bass (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Jerry B. Kurz (argued), Kathryn Hall, Hall & Kurz, Chicago, IL, for Defendant–Appellant.

Before COFFEY, FLAUM and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

This appeal presents a single question: whether a gun from which the firing pin has been removed is a "firearm" for purposes of sections 2B3.1(b)(2)(C) and 1B1.1 of the United States Sentencing Guidelines (U.S.S.G.) and the commentary thereto. Because we conclude that it is, we affirm the appellant's sentence.

## I.

When Sherard Dale Brown walked into Bank One in Springfield, Illinois intending to rob it, he carried in his waistband an unloaded gun. The gun had been given him by his putative getaway driver, in reality an undercover state police officer. Unbeknownst to Brown, the officer had removed the gun's firing pin. In any event, Brown didn't get very far: FBI agents arrested him as soon as he entered the bank.

Brown pleaded guilty to attempted bank robbery in violation of 18 U.S.C. § 2113(a), and the district court sentenced him to 64 months in prison. In computing Brown's sentence, the district court increased his offense level by five levels based on the court's determination that Brown possessed a "firearm" within the meaning of section 2B3.1(b)(2)(C) of the Sentencing Guidelines. After Brown's appointed counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), we instructed counsel to address the propriety of this five-level increase.

## II.

■ Subparagraph (C) of U.S.S.G. § 2B3.1(b)(2) prescribes a five-level increase in the defendant's base offense level "if a firearm was ... possessed" during a robbery offense, while subparagraph (E) of that section provides for a three-level increase "if a dangerous weapon was ... possessed."

Three being less than five, Brown contends that, although the gun he possessed was indeed a dangerous weapon, it was not a firearm under the Guidelines. Brown did not raise this argument below, and consequently we will vacate his sentence on this basis only if we determine that the district court committed plain error. See Fed.R.Crim. P. 52(b); *Johnson v. United States*, —— U.S. ——, —— – ——, 117 S.Ct. 1544, 1548–50, 137 L.Ed.2d 718 (1997); *United States v. Olano*, 507 U.S. 725, 731–37, 113 S.Ct. 1770, 1776–80, 123 L.Ed.2d 508 (1993). For the sake of our analysis, we will assume that it would constitute plain error had the district court increased Brown's offense level five levels, as opposed to three levels, as the result of an erroneous interpretation of the Guidelines. *See United States v. Robinson*, 20 F.3d 270, 273 (7th Cir.1994). Because the parties dispute neither Brown's possession of the gun nor its lack of a firing pin, the question we decide is a legal one.

For the applicable definition of firearm, we look to the application notes found in the commentary to U.S.S.G. § 1B1.1. See U.S.S.G. § 2B3.1, comment. (n.1). As defined in the commentary to section 1B1.1, firearm means

(i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device. A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.

U.S.S.G. § 1B1.1, comment. (n.1(e)). Brown argues that this definition does not encompass a gun that has been rendered inoperable by the removal of its firing pin.

Our research has uncovered no authority directly addressing this argument in the context of the Sentencing Guidelines. The same argument has, however, been considered by federal courts interpreting 18 U.S.C. § 921(a)(3), a statutory firearm definition that is identical, in all relevant respects, to

the definition at issue here.[1] See U.S.S.G.App. C, amend. 388 (amending Guidelines' firearm definition "to track more closely the definition of firearm in 18 U.S.C. § 921"). Noting that section 921(a)(3) does not require operability, a number of courts have held that damage to or removal of a firing pin does not bring a weapon outside the statute's broad definition of firearm. See *United States v. Hunter,* 101 F.3d 82, 83–86 (9th Cir.1996) (holding that § 921(a)(3) covers semiautomatic pistol rendered inoperable due to bent firing pin), cert. denied, — U.S. ——, 117 S.Ct. 1285, 137 L.Ed.2d 360 (1997) and — U.S. ——, 117 S.Ct. 1347, 137 L.Ed.2d 505 (1997); *United States v. Yannott,* 42 F.3d 999, 1006 (6th Cir.1994) ("[T]he broken firing pin merely temporarily altered the weapon's capability and did not so alter the weapon's design that it no longer served the purpose for which it was originally designed."); *United States v. Ruiz,* 986 F.2d 905, 910 (5th Cir.1993) ("[T]he filing down of the gun's hammer did not change the fact that the gun was designed to expel a projectile, but rather it merely temporarily altered the gun's capability to accomplish the purpose for which it was designed."); *United States v. York,* 830 F.2d 885, 891 (8th Cir. 1987) (rejecting claim that gun was not firearm where it was "inoperable because it had no firing pin, and ... the cylinder did not line up properly with the gun barrel"); see also *United States v. Reed,* 114 F.3d 1053 (10th Cir.1997) (holding that, despite testimony indicating gun required fifteen to twenty minutes' manipulation to work, jury could infer defendant knew inoperable shotgun was "designed to" expel projectile or was "frame" of shotgun, and that court properly excluded as cumulative further evidence of inoperability, including evidence that firing pin was missing); cf. *United States v. Buggs,* 904 F.2d 1070, 1075 (7th Cir.1990) (" 'The statute does not require that the Government prove the gun was actually capable of firing.' ") (quoting *United States v. Polk,* 808 F.2d 33, 34 (8th Cir.1986)).

Brown argues that these precedents should not be applied to his case. Although he acknowledges that the gun in question was "originally manufactured ... for the purpose of expelling a projectile," he reasons that, because its "firing pin was intentionally removed by" the undercover officer (Brown's emphasis), it was no longer, at the time of the robbery, "designed to" expel a projectile. The logical flaw in a case such as *Ruiz,* he asserts, is that it would insert the word "originally" before the definitional "designed to" clause. "[T]he major issue," Brown insists, "is ... intent." We understand this contention not as an argument for a mens rea requirement, for such a claim would be misplaced under the sentencing provisions at issue here, and, in any case, Brown concedes that he did not know the gun had been modified. Rather, we take Brown's argument to be that the point at which a gun becomes so altered that one cannot speak meaningfully of its original design must be determined with reference to the purpose behind the alteration.

Assuming (without deciding) that a weapon originally "designed to ... expel a projectile" may reach a point at which it is no longer designed to do so, we do not agree with Brown that the line is crossed with the removal of a gun's firing pin. To hang the inquiry entirely upon the "designed to" prong may indeed lead in some cases to unedifying circularities. See, e.g., *Ruiz,* 986 F.2d at 910 (reasoning that filing of gun's hammer "merely temporarily altered the gun's capability to accomplish the purpose for which it was designed"). The problem with Brown's approach, however, is that it focuses only on a portion of the relevant definition, which covers weapons that are "designed to or may readily be converted to expel a projectile by the action of an explosive." U.S.S.G. § 1B1.1, comment. (n.1(e)(i)) (emphasis added). In our view, this language must be read as a whole, and an

---

**1.** Section 921(a)(3) sets forth the following definition:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

alteration that renders a weapon inoperable cannot by itself remove the weapon from the Guidelines' firearm definition if the alteration does not preclude the weapon's being readily converted to operability.

■ Based on this understanding, the removal of a gun's firing pin is not so significant an alteration as to exclude the gun from the definition of firearm. See *Reed,* 114 F.3d at 1056, 1057 (upholding firearms conviction where defense witness testified that gun was workable after fifteen to twenty minutes of manipulation); cf. *United States v. Drasen,* 845 F.2d 731, 736 (7th Cir.1988) ("In adding the 'readily restored' clause to [the definition of rifle in 26 U.S.C. § 5845(c) ], Congress specifically intended to overcome *United States v. Thompson,* 202 F.Supp. 503 (N.D.Cal.1962), holding that a firearm with a missing firing pin was not a firearm under the [National Firearms] Act."). Brown suggests that the "readily" in "readily ... converted" should be read to require that a defendant possess the means to convert the weapon to an operable state in the course of the offense. Yet the commentary to section 1B1.1 contains no such requirement, and we are not inclined, absent some compelling reason, to read one into its definition. See *Yannott,* 42 F.3d at 1007 ("[I]t is irrelevant that defendant may not have known how to alter the weapon to render it operable."); see also *United States v. Maddix,* 96 F.3d 311, 316 (8th Cir.1996) (noting that ATF agent testified revolver was firearm under § 921(a)(3) "whether or not certain tools were required to load it"). Moreover, we are conscious of the fact that we do not write on a clean slate. In 1991, the Sentencing Commission amended the definition here under consideration "to track more closely the definition of firearm in 18 U.S.C. § 921." U.S.S.G.App. C, amend. 388. For some time now, section 921(a)(3)'s "readily ... converted" prong has been subject to a rather expansive judicial construction. See *United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns,* 443 F.2d 463 (2d Cir.1971) (holding that starter guns, which could be converted to fire live ammunition within three to twelve minutes by means of electric drill, could "readily be converted" within meaning of 18 U.S.C.

§ 921(a)). Given the Sentencing Commission's explicit decision to model its definition of firearm after the statute, we are not inclined to put a novel gloss on the definitional language.

■ Finally, were there any doubt as to whether the gun Brown possessed met the definition of firearm, we are satisfied that it qualified as "the frame ... of any such weapon." See U.S.S.G. § 1B1.1, comment. (n.1(e)(ii)); *Reed,* 114 F.3d at 1057 ("The jury could certainly infer that defendant knew the gun was 'designed to' expel a projectile, or that it was the 'frame' of such a weapon."); *Hunter,* 101 F.3d at 85 ("[U]nder 18 U.S.C. § 921(a)(3), the term 'firearm' includes mere parts of a gun which alone are incapable of firing, such as the frame. . . .").

For the foregoing reasons, we Affirm Brown's sentence.